Glynda L. HALL, Plaintiff,

v.

**BAPTIST MEMORIAL HEALTH CARE CORPORATION d/b/a Baptist Memorial College of Health Sciences, Defendant.**

No. 98–CV–2035–DA.

United States District Court,
W.D. Tennessee,
Western Division.

Nov. 23, 1998.

Clyde W. Keenan, Keenan Fox & Lightsey, Memphis, TN, Wendy Dabbous, Keenan Fox and Dabbous, Memphis, TN, for Glynda L. Hall, plaintiff.

Paul E. Prather, Robert D. Meyers, Kiesewetter Wise Kaplan Schwimmer & Prather, Memphis, TN, for Baptist Memorial Health Care Corp., d/b/a Baptist Memorial College of Health Sciences dba Baptist Memorial College of Health Sciences, defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

DONALD, District Judge.

Before this court are the cross motions of Plaintiff, Glynda Hall, and Defendant, Baptist Memorial Health Care Corporation d/b/a Baptist Memorial College of Health Sciences for summary judgment on Plaintiff's claim for religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"). Plaintiff avers that Defendant terminated her solely because of a conflict between her own religious beliefs and those of the Defendant. Plaintiff further contends that Defendant has not rebutted her prima facie case of religious discrimination. Because Defendant failed to accommodate Plaintiff's religious beliefs and has not shown any undue hardship which prevented such accommodation, Plaintiff argues that she is entitled to summary judgment on her claim of religious discrimination under Title VII.

Defendant contends that it did not terminate Plaintiff because of her religious beliefs or church affiliation and therefore could not have violated Title VII. Alternatively, Defendant asserts that it is immune from Title VII liability for religious discrimination under the exemptions of 42 U.S.C. § 2000e–1(a) and 42 U.S.C. § 2000e–2(e)(2).

For the following reasons, the court grants summary judgment to Defendant on Plaintiff's claims of religious discrimination under Title VII.

## I. FACTS

Baptist Memorial Health Care Corporation ("Health Care Corporation") is a nonprofit corporation established "for carrying out a health care mission consistent with the traditional and on-going health care missions of the Arkansas, Mississippi, and Tennessee Baptist Conventions and their affiliated Baptist churches with which the corporation shares common religious bonds and convictions." (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 1). The Health Care Corporation is the parent corporation of Baptist Memorial Hospital ("Hospital") and selects its board of directors. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶¶ 2, 5). The Hospital is the parent corporation for Baptist Memorial College of Health Sciences ("College") and appoints the College's board of directors. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶¶ 2, 5). The College receives financial support from both the Hospital and the Health Care Corporation.[1] (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 7).

The Health Care Corporation's mission statement expresses its commitment to the "threefold ministry of Christ—preaching, teaching and healing." (Baker Aff., Ex. 3). The bylaws of the Health Care Corporation require all of its directors to be members of Baptist churches affiliated with the state Baptist Conventions in the tri-state area. (Baker Aff.Ex. 1). The Health Care Corporation also submits annual reports and certified audits to the Arkansas, Mississippi and Tennessee Baptist Conventions. (Baker Aff. ¶ 6).

The Hospital's charter states that it is organized for "charitable, educational, religious and scientific" purposes and that its purposes include "hospital and health care and education ... in line with the traditional and ongoing mission of the Baptist churches

---

1. Although Defendant offers the affidavit of Rose Temple, President of the College, as evidence supporting its characterization of the amount of money received from the Hospital and the Health Care Corporation as "heavy financial support", Defendant offers no numerals or percentages to enable the court to make its own evaluation of whether the money received should be considered as heavy support. Absent such evidence, the court will not undertake to describe the level of support received by the College from the Hospital and the Health Care Corporation.

affiliated through their State Baptist Conventions in Arkansas, Mississippi and Tennessee with the Southern Baptist Convention as now known and practiced among Baptists." (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 3). The Hospital's bylaws state that its primary purpose is to "provide Hospital and related health services, education, and scientific research in accordance with Christian principles as set out in the Charter of Incorporation, in line with the mission of the sole member, Baptist Memorial Health Care Corporation." (Baker Aff., Ex. 2). In the event of the Hospital's dissolution, all remaining assets are to be transferred to the Baptist Memorial Health Care Corporation, if that organization qualifies for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, and then to the Baptist Memorial Health Care System if the Health Care Corporation does not qualify for such status. (Baker Aff., Ex. 2). If the Health Care System does not qualify for 501(c)(3) status, then the remaining assets are to be distributed to the State Baptist Conventions of Arkansas, Mississippi and Tennessee, unless such conventions fail to qualify as 501(c)(3) organizations. (Baker Aff., Ex. 2).

The College was founded by the Mississippi, Arkansas and Tennessee Baptist Conventions. (Temple Dep., p. 82). In its brochures and bulletins, the College describes its mission as "[t]o provide quality baccalaureate and continuing education in a Christian atmosphere." (Temple Aff., Ex. 1). This mission is based upon the threefold ministry of Christ: preaching, teaching and healing. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 10). The College's motto is identified as "higher education with a higher purpose." (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 12). The College offers baccalaureate degrees in Nursing and Health Sciences. (Temple Aff., Ex. 2). The College does not offer any degrees in religion and requires only one three-hour course in religion for its degree programs. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 21). Students may fulfill this requirement by taking Comparative Religion, Literature of the Bible or Spiritual Aspects of Care. (Barkley Dep., p. 20). The College has also offered a course entitled, College Chorus, which was directed by the minister of music at First Baptist Church in Memphis. (Def.'s Rule 26 Initial Disclosures, Tab J). The College does not offer courses providing instruction in the Baptist faith or in the tenets of the Southern Baptist Convention. (Barkley Dep., pp. 20, 22, 29).

The College has placed recruiting advertisements in several Baptist newspapers across the southern states. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 9). The College has also recruited students at the State Baptist Conventions in Mississippi, Arkansas and Tennessee by sending college representatives, faculty members and a student recruiter to set up displays providing information about the College. (Def.'s Rule 26 Initial Disclosures, Tab 3). The College has offered voluntary, monthly chapel programs during the fall and spring semesters. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 19). Many of the speakers at these programs were pastors or ministers from local Baptist churches. (Def.'s Rule 26 Initial Disclosures, Tab X). Moreover, the College has conducted prayer breakfasts, held Vacation Bible School for young children and served as host for a meeting of World Changers, a mission organization sponsored by the Brotherhood Commission and the Southern Baptist Convention. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 20; Def.'s Rule 26 Initial Disclosures, Tab 1). The College has held several commencement ceremonies at First Baptist Church in Memphis, Tennessee. (Def.'s Rule 26 Initial Disclosures, Tab V).

In August, 1995, the College hired Plaintiff as a Student Services Specialist and placed her under the supervision of Dr. Paul Barkley ("Barkley"). (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶¶ 22, 31). As a student services specialist, Plaintiff worked with students and the College's administration in organizing and planning activities of various campus student organizations. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 23). Plaintiff was entrusted with the responsibility of interpreting school policies to ensure that all student activities were consistent with the goals and objectives of the College. (Def.'s Mem. in Supp. of Def.'s

Mot. for Summ. J. ¶ 24). Plaintiff's position also required her to work with the College's Christian student organization by coordinating their involvement with the student ministries department of the Tennessee Baptist Convention. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 25). This duty required Plaintiff to attend meetings of the Tennessee Baptist Convention. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 25).

At the time Plaintiff was hired, she had been attending Holy Trinity Community Church ("Holy Trinity") since February 1995. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 27). Plaintiff describes Holy Trinity as a non-denominational church which focuses on outreach to all persons seeking a relationship with Jesus Christ. (Hall Dep., p. 37). Holy Trinity has a large congregation of homosexual members. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 27). The church believes that there is nothing inherently inconsistent between the homosexual lifestyle and Christianity.[2] (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 28). Pursuant to this belief, Holy Trinity publicly expresses its acceptance of gay and lesbian members. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 28). Holy Trinity's outreach efforts include advertising in publications targeted toward the gay and lesbian community. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 28). Holy Trinity has also held several religious services tailored toward the issues and needs of the gay and lesbian community. (Hall Dep., p. 38).

In the spring of 1996, Plaintiff began the process of becoming a minister at Holy Trinity. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 30). In the summer of 1996, Barkley inquired into what church Plaintiff attended. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 32). Plaintiff informed Barkley that she attended Holy Trinity. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 32). Based on his suspicions that

Holy Trinity openly advocated homosexuality, Barkley approached Dr. Rose Temple ("Temple"), the President of the College, and informed Temple that Plaintiff was attending Holy Trinity. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 33). After Barkley told her about his suspicions, Temple told Barkley that where Plaintiff attended church services was her choice and that the College would not make an issue of her choice. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 33).

Plaintiff was ordained as a minister at Holy Trinity in early September 1996. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 34). Plaintiff did not invite Barkley to her ordination ceremony because she feared she would be fired if Barkley discovered she was a lesbian and that Holy Trinity welcomed gay and lesbian members. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 35). However, Plaintiff did inform Barkley that she was a lesbian shortly after her ordination. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 36). Plaintiff also brought Barkley the *Second Stone*, a national newspaper for gay, lesbian and bisexual Christians. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶¶ 37, 38). The newspaper featured articles about political and religious issues of interest to the gay and lesbian community. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 38). Plaintiff showed Barkley an advertisement for Holy Trinity in the newspaper. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 39).

When Barkley saw Holy Trinity's advertisement in the *Second Stone*, he recognized a conflict between Plaintiff's ordination at Holy Trinity and the religious beliefs of the College's Southern Baptist constituency. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 40). The Southern Baptist Convention considers homosexuality to be a sin and is outspoken against the homosexual lifestyle. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 26). In their resolution on

---

2. The court is wary about announcing the doctrinal beliefs of any particular church. Such matters are normally better left to the ecclesiastical realm. The court's description of Holy Trinity's beliefs should not be construed as a definitive pronouncement of the tenets embraced by this church. However, for the limited purpose of litigation, both parties have agreed, through their pleadings, motions and supporting memoranda, that this statement is an accurate rendition of the beliefs held by the members of Holy Trinity on this matter.

homosexuality, the delegates to the Southern Baptist Convention described homosexuality as "an abomination in the eyes of God" and "a perversion of divine standards and as a violation of nature and natural affection." (Baker Aff., Ex. 4).

Barkley brought the newspaper to Temple. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 42). Temple decided that Holy Trinity's views on homosexuality were inconsistent with the College's mission statement because of the Southern Baptist Convention's views on homosexuality and the College's relationship to the Southern Baptist Convention. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 44). Temple further decided that the College could not allow Plaintiff to continue to work for the College. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 46). Temple perceived Plaintiff's position at the College to be one where she had considerable influence over students. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 45). Temple believed that a serious conflict existed between Plaintiff's employment at the College in a position of influence and her ordination as a minister in a church which espoused views contrary to those held by the Southern Baptist Convention. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 46). Temple then gave Plaintiff a resignation form to sign. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 47). When Plaintiff did not sign it, she was terminated. (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ¶ 48).

## II. SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence and inferences based on facts must be viewed in a light most favorable to the nonmoving party. *Kochins v. Linden–Alimak, Inc.* 799 F.2d 1128, 1133 (6th Cir.1986).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element es-

sential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once a properly supported motion for summary judgment is made, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," Fed.R.Civ.P. 56(e), but must—by affidavits or evidence—"come forward with some probative evidence in support of its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991), *cert. denied,* 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. ANALYSIS

### A. TITLE VII'S EXEMPTIONS

Discrimination in employment on the basis of religion is prohibited by the provisions of Title VII. Title VII states in relevant part:

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin;

42 U.S.C. § 2000e–2(a).

This provision prohibits an employer from discriminating against an employee on the basis of that employee's religious beliefs or practices. *See* Definitions at 42 U.S.C. § 2000e(j). Plaintiff relies upon this provision as support for her claim of religious discrimination against Defendant.

However, Title VII's prohibition against discrimination on the basis of religion does not apply to all organizations. Title VII explicitly grants religious organizations exemption from its prohibition against religious discrimination in certain circumstances. Those exemptions are found, in part, at § 2000e–1(a), which states in relevant part:

This subchapter shall not apply to ... *a religious corporation, association, educational institution, or society* with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e–1(a) (emphasis added).

and at § 2000e–2(e), which states in relevant part:

[I]t shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of higher learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e–2(e).

Defendant contends that it is a religious educational institution and, as such, is entitled to these statutory exemptions from Title VII liability. Accordingly, Defendant urges this court to grant its motion for summary judgment because Plaintiff's claim against it is barred by Title VII's exemptions.

The threshold inquiry in this case is to determine whether Defendant is exempt from liability for religious discrimination. To qualify for exemption under 42 U.S.C. § 2000e–1(a), a defendant must be "a religious corporation, association, educational institution, or society." The United States Court of Appeals for the Sixth Circuit has not had occasion to address the question of what constitutes a "religious corporation, association, educational institution, or society." In absence of such authority, this court looks for guidance to the analytical approaches employed by other federal courts in determining whether a particular organization qualifies for exemption under § 2000e–1(a).

In *E.E.O.C. v. Townley Engineering & Manufacturing Co.*, 859 F.2d 610 (9th Cir. 1988), *cert. denied*, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989), the court was faced with the question of whether a closely held corporation which manufactured mining equipment should qualify for exemption under 42 U.S.C. § 2000e–1(a)[3], where the founders intended for their business to be "a Christian, faith-operated business." The court relied upon the relevant legislative history of Title VII to conclude that Congress intended for § 2000e–1(a) to be construed narrowly. *Townley* at 617–18. The court stated that the Congress "assumed that only those institutions with extremely close ties to organized religions would be covered." *Id.* at 618.

Although the *Townley* court was reluctant to specify the exact contours of § 2000e–1(a), it did announce a balancing test to determine whether an organization is sufficiently religious to warrant exemption from Title VII liability. *Id.* The court stated that, "all significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious." *Id.* The *Townley* court relied upon the defendant's for profit status, the secular nature of the product it manufactured, its lack of affiliation or support from any church and the absence of any explicit religious purpose to conclude that defendant's business was primarily secular and therefore not entitled to exemption under Title VII. *Id.* at 619.

The United States Court of Appeals for the Eleventh Circuit has also employed a totality of the circumstances analysis in determining whether an organization qualifies for exemption from Title VII liability under § 2000e–1(a). In *Killinger v. Samford University*, 113 F.3d 196 (11th Cir.1997), the court was called upon to determine whether Samford University was sufficiently religious to qualify for Title VII exemption. The

---

**3.** In the *Townley* opinion the relevant exemption is referred to as "section 702." This provision of the Civil Rights Act of 1964 is codified at 42 U.S.C. § 2000e–1(a) and will henceforth be referred to as " § 2000e–1(a)."

court noted that the United States Court of Appeals for the Fifth Circuit had examined all of the surrounding circumstances to determine if Mississippi College was a religious educational institution in *EEOC v. Mississippi College,* 626 F.2d 477 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981). *Killinger* at 198–99. The *Killinger* court concluded that Samford University was a religious educational institution based upon the university's founding as a theological institution by the Baptist Convention, a requirement that all trustees be Baptists, receipt of seven percent of its annual budget from the Baptist Convention, a requirement that all faculty teaching religion courses sign a Baptist Statement of Faith and Message, and a statement in its charter declaring the promotion of Christianity to be its chief purpose. *Id.* at 199.

■ Without adopting the Ninth Circuit's conclusion that § 2000e–1(a) should be construed narrowly, the court does find the weighing of an organization's sectarian and secular characteristics to be an appropriate method to determine whether Defendant's college is a religious educational institution. Defendant's college was founded by sectarian organizations: the Mississippi, Arkansas and Tennessee Baptist State Conventions. At the dedication of the College, prayers were offered and spiritual hymns were sung. The dedicatory prayer stressed the need for faculty, staff and trustees to emulate Jesus Christ in their lives and teach His principles to the College's students. The College's avowed mission is to provide quality baccalaureate and continuing education in a Christian atmosphere. The College avers that this mission is based upon Christ's three-fold ministry: preaching, teaching and healing. The College's seal depicts two hands representing service and scholarship on a Bible adjacent to a branch representing the tree of knowledge and includes the motto "higher education with a higher purpose."

The College has also hosted several religious functions. From January 1996 to January 1997, the College held three prayer breakfasts. These prayer breakfasts were led by the College's faculty and staff and featured speaking and singing. Between February 1996 and April 1997, the College held nine monthly chapel programs for the spring and fall semesters. During the summer of 1996, the College held a Vacation Bible School for more than thirty children and served as host for two meetings of "World Changers", a mission organization for young adults sponsored by the Southern Baptist Convention.

The College has many ties to Baptist churches. Many of the speakers at the chapel programs hosted by the College have been ministers at Baptist churches. Several of the College's commencement ceremonies have been held at First Baptist Church in Memphis, Tennessee. Each semester, Ray D. Hatton, the Minister of Music at First Baptist Church, teaches a college chorus class emphasizing sacred Christian music for the College. The College advertises in Baptist newspapers in at least seven states and has sent recruiting representatives to the Baptist State Conventions in Mississippi, Arkansas and Tennessee.

These religious characteristics of the College must be weighed against its secular characteristics. Plaintiffs contend that the College's curriculum indicates that the institution is primarily secular in nature. The College does not offer any degrees in religion or theology. The College only requires one three-hour course in religion for degree programs and offers only three religious courses to satisfy that requirement. Moreover, these courses do not teach Baptist doctrine or the tenets of faith held by the Southern Baptist Convention. Rather, the course descriptions indicate that the classes are not taught with any strong denominational bent. Although some of the faculty are ordained Baptist ministers, the College does not require its faculty, staff or students to be members of Baptist churches. Moreover, Temple testified in her deposition that the College is not owned by any religious institution. Plaintiff relies upon these secular characteristics to support its claim that the College is not a religious educational institution and therefore is not entitled to exemption under § 2000e–1(a).

■ Based on the foregoing, the court concludes that Defendant has proffered suffi-

cient evidence to support its characterization of the College as a religious educational institution. The purposes and programs of the College are permeated with a conviction to adhere to Christian principles while providing education in Nursing and Health Sciences. Unlike the corporation in *Townley,* Defendant's college has a clear relationship with the Baptist church. In light of the overwhelming evidence of the College's religious activities and nature, the mere fact that the College only requires one three-hour course in religion is not sufficient to deprive it of its appropriate classification as a religious educational institution. Moreover, the College does not have to hire only Baptists or follow a strict policy of religious discrimination to be eligible for the Title VII exemption in § 2000e–1(a). *See, e.g. Killinger* at 199–200; *E.E.O.C. v. Presbyterian Ministries, Inc.,* 788 F.Supp. 1154 (W.D.Wash. 1992).

 Plaintiff argues that, even if Defendant should be considered a religious educational institution, its exemption was expressly waived when Defendant held itself out to be an equal opportunity employer in its advertisements, employee handbook, policy and procedure manual and mission statement. Plaintiff's argument demonstrates a misunderstanding of the exemption granted by Congress in § 2000e–1(a). The Title VII exemption is not a privilege which can be invoked or waived at Defendant's discretion. Rather, the exemption represents a Congressional decision to protect the free exercise of religion under the First Amendment to the Constitution by minimizing governmental intrusion upon religious organizations. In essence, Congress has decided that the right to be free from religious discrimination from religious organizations is outweighed by the rights of those organizations to be free from government intervention. *See Little v. Wuerl,* 929 F.2d 944, 951 (3rd Cir.1991). There is nothing Defendant could have done to negate this policy decision of Congress.

Plaintiff has not raised a genuine dispute about any fact material to Defendant's exemption under § 2000e–1(a). This court therefore concludes that Defendant is a religious educational institution under § 2000e–

1(a) and is exempt from any Title VII liability arising from Plaintiff's claim of religious discrimination. Because Defendant is exempt from Title VII liability under § 2000e–1(a), there is no need for the court to address Defendant's assertion that it is also exempt from Title VII liability under 42 U.S.C. § 2000e–2(e)(2).

## B. RELIGIOUS DISCRIMINATION CLAIM

Even if Defendant were not exempt from Title VII liability for religious discrimination, Plaintiff's claim would not survive Defendant's motion for summary judgment. Plaintiff has not offered any credible evidence that the Defendant's asserted reason for terminating her was pretextual. Absent such evidence, Plaintiff does not raise an issue of fact for a jury.

 In a Title VII action for religious discrimination, the plaintiff has the initial burden of establishing a prima facie case that her employer discriminated against her because of her religion. *Beaven v. Commonwealth of Kentucky,* 783 F.2d 672, 675 (6th Cir.1986). A plaintiff may establish a prima facie case of discrimination by offering direct evidence of intentional discrimination or circumstantial evidence which creates an inference of discrimination. *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1246 (6th Cir.1995). In cases of circumstantial evidence, the plaintiff must show 1) that she was a member of a protected group, 2) that she was subject to an adverse employment decision, 3) that she was qualified for the position, and 4) she was replaced by a person outside of the protected class. *Id.* The fourth element may be proved by showing that similarly situated non-protected employees were treated more favorably. *Id.* Once the plaintiff has established her prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.*

 No one contests whether Plaintiff has satisfied the first three elements of her prima facie case for religious discrimination. As a member and minister of a religious

community which holds beliefs differing greatly from those held by the College's administration, Plaintiff is an individual who is protected by Title VII's prohibition against religious discrimination in employment. Plaintiff's termination from employment with the College certainly constitutes an adverse employment decision. Moreover, the College has not raised any questions as to whether Plaintiff was qualified for the job or performing her duties adequately. Quite to the contrary, Plaintiff's supervisor rated her work performance as exemplary and accomplished. The real question is whether Plaintiff has satisfied the fourth element of her prima facie case.

■ Although Plaintiff has not offered any evidence that she was replaced by an individual with religious beliefs differing from her own, this lack of evidence is not fatal to her claim. Under *Talley,* Plaintiff may establish the fourth element by showing that similarly situated non-protected employees received more favorable treatment than she did. In the present case, that requirement would translate into a need to show that an employee holding religious beliefs consistent with those held by the College's administration and different from those held by Plaintiff was treated more favorably than her. However, Plaintiff did not demonstrate that the College had ever treated an employee who assumed a leadership role in an organization expressing public support for homosexuals and the homosexual lifestyle any differently than it treated her. Without this demonstration, Plaintiff cannot establish a prima facie case of religious discrimination.

■ Even if the court assumes, arguendo, that Plaintiff has established a prima facie case of religious discrimination, her claim still must fail for failure to prove that Defendant's articulated reason for terminating her was pretextual. Defendant asserts that it terminated Plaintiff because she had assumed a leadership role in an organization

espousing beliefs diametrically opposed to those held by the College itself. In her deposition, Temple stated that Plaintiff's ordination as a minister at Holy Trinity was the catalyst for her termination.[4] Temple expressed her belief that Plaintiff's position as a minister for Holy Trinity was a position of leadership, irrespective of whether she had done any preaching or public speaking at that time. Temple perceived a conflict between Hall's leadership position in an organization which publicly embraced and supported homosexuals and her employment at a College founded by and affiliated with those who consider homosexuality to be a sin and a perversion in the eyes of God. In short, the Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination and offered credible evidence to support the veracity of that reason.

Plaintiff has not offered any evidence to rebut Defendant's claim that it terminated Plaintiff because of her assumption of a leadership position in an organization which publicly expressed beliefs about homosexuality contrary to those held by the Defendant. Plaintiff has not offered any evidence that Defendant has failed to discharge any employee who has assumed a leadership position in an organization expressing views supportive of the homosexual lifestyle. Despite this lack of evidence, Plaintiff contends that Defendant terminated her because of her ordination as a minister at Holy Trinity and therefore clearly discriminated against her because of her religious practices. This argument is deceptive. While it is true that Defendant terminated Plaintiff because of her ordination at Holy Trinity, that fact alone does not necessarily mean that Defendant terminated her because of the religious nature of either her ordination as a minister or her affiliation with Holy Trinity. Rather, Defendant asserts that it terminated Plaintiff because her ordination made her a leader in an organization which held and expressed

---

4. Plaintiff asserts that Defendant terminated her solely because of her affiliation with Holy Trinity Community Church. However, this assertion is contradicted by the uncontested deposition testimony of Temple and Barkley, who both stated that Temple responded to Barkley's concerns about Plaintiff's attendance at Holy Trinity by telling Barkley that where Plaintiff attended church services was her choice and that the College would not make her attendance at Holy Trinity an issue. Temple terminated Plaintiff only after learning she had been ordained as a minister at Holy Trinity.

views on homosexuality which were inconsistent with Defendant's perception of its purpose and mission. Defendant's termination of Plaintiff was an attempt to preserve the integrity of its views on homosexuality in its college environment. The fact that the organization which appointed Plaintiff to a leadership position happened to be religious does not transform an attempt to maintain an atmosphere consistent with those views into an act of prohibited religious discrimination. Plaintiff even conceded that she believed Defendant would have fired her if she had been elected president of a local gay and lesbian coalition or had made a televised speech opposing the Southern Baptist Convention on gay and lesbian issues. Although such a concession does not prove that the Defendant did not discriminate against Plaintiff on the basis of religion, it does provide further support for Defendant's contention that it fired Plaintiff, not because of her religious beliefs or practices, but because of her leadership position in an organization which publicly advocated gay and lesbian issues.

■ Plaintiff argues that Defendant's treatment of Cynthia Miller demonstrates that its legitimate, nondiscriminatory reason for terminating Plaintiff is pretextual. Miller is a faculty member at the College and an ordained minister in the Christian Methodist Episcopal church. Plaintiff avers that Miller's ordination as a female minister violates one of the tenets of the Southern Baptist Convention. Based on this averment, Plaintiff contends that the College should have terminated Miller because she is a member of an organization which holds views on the ordination of women contrary to those held by the Southern Baptist Convention. Plaintiff alleges that the difference in how the College has treated Plaintiff and Miller provides evidence that Defendant's legitimate, nondiscriminatory reason is pretextual.

Plaintiff's contention is without merit for several reasons. The first flaw in Plaintiff's argument is the lack of support from the record for its averment that the ordination of women violates the official tenets of the Southern Baptist Convention. The only support for this statement comes from Temple's deposition testimony. Temple stated that she grew up in the Southern Baptist tradition and understood that women were not ordained as ministers to be pastors in churches. However, Temple also stated that she was aware that controversy existed within the Southern Baptist Convention over the question of whether women should be ordained as ministers. Plaintiff did not submit to the court any resolutions from the Southern Baptist Convention or from any State Baptist Convention declaring opposition to the ordination of women. This court cannot rely upon the recollections of one individual to establish the official doctrine of the Southern Baptist Convention. Moreover, Temple's statement that controversy existed among the Southern Baptist Convention over the ordination of women suggests that its affiliated Baptist churches may not have reached a consensus on the question of ordination of women. Plaintiff cannot rely upon the College's treatment of Miller to prove pretext until she can demonstrate that the Southern Baptist Convention has officially prohibited the ordination of women as it has prohibited homosexuality.

■ However, the most troubling aspect of Plaintiff's argument is that it places the federal courts in a role contrary to the spirit of the First Amendment. In essence, the Plaintiff is requesting this court to tell the Defendant that it must be opposed to the ordination of women with the same degree of conviction and intensity it has expressed in its opposition to the gay and lesbian lifestyle, or suffer liability under Title VII. The federal courts are not in the business of enforcing religious orthodoxy or requiring consistency and uniformity in religious beliefs or practices. If a particular religious community wishes to differentiate between the severity of violating two tenets of its faith, it is not the province of the federal courts to say that such differentiation is discriminatory and therefore warrants Title VII liability. If it were otherwise, courts would be compelled to inquire into the religious beliefs of organizations and enforce compliance with all tenets of a particular faith under threat of Title VII liability. Such judicial intrusion into religion cannot be tolerated under the Establishment and Free Exercise Clauses of the First

Amendment, which were designed "to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other." *Lynch v. Donnelly,* 465 U.S. 668, 672, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)).

Plaintiff also avers that the College was aware of an adulterous affair between two of its staff members and failed to discharge either of them. Plaintiff relies upon this averment to support its contention that the College applied a double standard to Plaintiff when it terminated her for assuming a leadership position in an organization which espoused values inconsistent with the tenets of the Southern Baptist Convention. This argument is also without merit. In her deposition testimony, Temple stated that she was not aware of the alleged adulterous affair or any divorces resulting from that alleged affair. Although Temple admitted that there had been "some talk" about the two employees, she also stated that both individuals had been counseled and that no admission of guilt resulted from the counseling. Where Plaintiff has not offered proof that Temple was aware of the alleged adulterous affair, she cannot rely upon the College's failure to discharge the individuals allegedly involved in the affair to prove that Defendant was inconsistent in its treatment of Plaintiff. *See Boyd v. Harding Academy of Memphis, Inc.,* 88 F.3d 410, 414 (6th Cir.1996) (rejecting plaintiff's evidence of pretext where plaintiff could not prove that religious school had knowledge of sexual misconduct by other employees during the time they were employed by the school).

Plaintiff has failed to offer any credible evidence that Defendant terminated her for any reason other than the conflict of interest existing between Plaintiff's leadership role at Holy Trinity and her employment as a student services specialist at the College. Where the Defendant has asserted a legitimate, nondiscriminatory reason for Plaintiff's discharge and Plaintiff has failed to prove pretext, this court must grant Defendant's motion for summary judgment.

## IV. ORDER

Based on the foregoing, Defendant's motion for summary judgment on Plaintiff's claim of religious discrimination under Title VII is **GRANTED.** Plaintiff's motion for summary judgment on her Title VII claim of religious discrimination is **DENIED.**