discharged because he did not share supervisor's Mormon beliefs). Even if this case could be so characterized, the evidence shows that the College president had a list of available positions she offered to help Hall obtain if Hall would have agreed to resign her position as a Student Services Specialist. Hall declined this reasonable accommodation and was terminated.

## III.

Accordingly, the judgment of the district court granting defendant's motion for summary judgment is AFFIRMED.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0199P (6th Cir.)
File Name: 00a0199p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT



GLYNDA L. HALL,
        *Plaintiff-Appellant,*

        *v.*                                    No. 98-6761

BAPTIST MEMORIAL HEALTH
CARE CORPORATION, d/b/a
Baptist Memorial College of
Health Sciences,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 98-02035—Bernice B. Donald, District Judge.

Argued: December 10, 1999

Decided and Filed: June 13, 2000

Before: BOGGS and SUHRHEINRICH, Circuit Judges;
POLSTER, District Judge.[*]

_____

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

_____

**COUNSEL**

**ARGUED:** Clyde W. Keenan, KEENAN, DABBOUS & LAZARINI, Memphis, Tennessee, for Appellant. Paul E. Prather, KIESEWETTER, WISE, KAPLAN, SCHWIMMER & PRATHER, Memphis, Tennessee, for Appellee. **ON BRIEF:** Clyde W. Keenan, KEENAN, DABBOUS & LAZARINI, Memphis, Tennessee, for Appellant. Paul E. Prather, KIESEWETTER, WISE, KAPLAN, SCHWIMMER & PRATHER, Memphis, Tennessee, for Appellee.

_____

**OPINION**
_____

POLSTER, District Judge. Plaintiff-Appellant Glynda L. Hall sued her former employer, Defendant-Appellee Baptist Memorial College of Health Sciences (the "College"), under Title VII, 42 U.S.C. § 2000e(5), alleging that the College unlawfully terminated her employment based on her religion. The district court entered summary judgment in favor of the College. For the following reasons, we affirm.

**I.**

Baptist Memorial Health Care Corporation ("Health Care Corporation" or "Corporation") is a nonprofit corporation established with the purpose of "carrying out a health care mission consistent with the traditional and ongoing health care missions of the Arkansas, Mississippi and Tennessee Baptist Conventions and their affiliated Baptist churches with which the Corporation shares common religious bonds and convictions." *Joint Appendix ("JA") 284-85*. It is committed to the "threefold ministry of Christ -- preaching, teaching and healing." *JA 308*. To this end, the Corporation is authorized to "acquire, own, lease, manage, operate, sell, construct, finance, provide services to, generally deal with, and affiliate

showing that she was fired for any reason other than taking a leadership position in an organization that condones a lifestyle the College considers antithetical to its mission. Thus, the district court correctly found that Hall failed to show that this reason was a pretext for religious discrimination.

Hall endeavors to put a "reasonable accommodation" (as opposed to disparate treatment) spin on this issue. In reasonable accommodation religious discrimination cases, a plaintiff must establish that it holds a sincere religious belief that conflicts with an employment requirement, that it informed the employer of the conflict, and that it was discharged or disciplined for failure to comply with the conflicting requirement. *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (citing *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987), *cert. denied*, 485 U.S. 989 (1988)). That analysis is not relevant to this case, since Hall's employer did not direct her to do anything that conflicted with her religious beliefs, and Hall was not terminated over a failure to perform any duties which conflicted with her religious beliefs. *See, e.g., Cooper*, 15 F.3d 1375 (Seventh Day Adventist sues employer for requiring her to work on her Sabbath Day); *Cowan v. Gilless*, No. 95-5679 , 1996 WL 145873 (6th Cir. Mar. 29, 1996); *Riselay v. Secretary of Health and Human Servs.*, No. 90-1779, 1991 WL 44319 (6th Cir. Apr. 2, 1991) (Christian Scientist sues employer for failing to allow sick leave); *E.E.O.C. v. University of Detroit*, 904 F.2d 331 (6th Cir. 1990) (Catholic employed by closed-shop employer refuses to pay dues to union because of union's affiliation with organizations supporting abortion); *Stanley v. Lawson Co.*, 993 F. Supp. 1084 (N.D. Ohio 1997) (Christian sues employer who requires her to sell adult magazines); *Favero v. Huntsville Indep. Sch. Dist.*, 939 F. Supp. 1281 (S.D. Tex. 1996) (Worldwide Church of God members sue employer for failing to give them extended leaves to observe their holy days). *But see Shapolia v. Los Alamos Nat'l Laboratory*, 773 F. Supp. 304 (D. N.M. 1991) (employee alleges he was

comparison is also flawed because Hall has not alleged that she was terminated for conducting an illicit affair, but for her membership in Holy Trinity. The district court correctly concluded that Hall failed to establish that a similarly-situated co-worker received more favorable treatment than she did.

Even assuming that Hall had set forth a *prima facie* case, she has failed to show that the reason for her termination was a pretext for discrimination based on her religion. The College contends that it terminated Hall because she assumed a leadership position in an organization that publicly supported homosexual lifestyles, a view that clashed with the Southern Baptist Convention's outspoken denunciation of homosexuality and the College's avowed mission. Because she exerted influence over students and student activities at the College, her leadership position at Holy Trinity conflicted with her job.

The record in this case is consistent. It shows that the College tolerated employees of different faiths or no faiths, e.g., Methodists, Seventh Day Adventists, and atheists. It also shows that the president of the College concluded that where Hall went to church was her business, and that Hall suffered no adverse consequences when it became known that she was a member of Holy Trinity.

To show that the termination was based on her religion, Hall must show that it was the *religious* aspect of her leadership position that motivated her employer's actions. *Cf. Shahar v. Bowers*, 114 F.3d 1097, 1118 (11th Cir. 1997). There is no evidence that the religious nature of Hall's leadership role at Holy Trinity contributed to her termination. Hall testified that the College would have fired her if she had been elected president of a local gay and lesbian coalition, or if she had made a televised speech opposing the Southern Baptists' position on the issue of homosexuality. The fact that the organization in which she assumed a leadership position is a church does not transform her dismissal into one based on religion. Hall has made no additional evidentiary

with or be the parent organization of separately incorporated hospitals, clinics, home health care organizations, rehabilitation centers, health maintenance organizations, hospices, nursing homes, nursing and other schools, educational organizations and institutions. . . . " *JA 285.*

The chief executive officer and all directors of the Health Care Corporation must be members of Baptist churches affiliated with the State Baptist Convention in the states of their residence. The Corporation submits annual reports and certified audits to the Arkansas, Mississippi and Tennessee Baptist Conventions. The Corporation is the parent of Baptist Memorial Hospital which, in turn, is the parent of Baptist Memorial College of Health Sciences. The Corporation chooses the Hospital's board of directors which, in turn, appoints the board of directors for the College.

The Hospital's charter states that it is a nonprofit corporation organized for "charitable, educational, religious and scientific" purposes and that its purposes include "hospital and health care and education . . . in line with the traditional and ongoing mission of the Baptist churches affiliated through their State Baptist Conventions in Arkansas, Mississippi and Tennessee with the Southern Baptist Convention as now known and practiced among Baptists." *JA 297.* The Hospital's bylaws state that its primary purpose is to provide "health services, education and scientific research in accordance with Christian principles as set out in [its charter] in line with the mission of the [Hospital]." *JA 300.* In the event of the Hospital's dissolution, all remaining assets must be transferred to the Health Care Corporation if that organization qualifies for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. If the Corporation does not qualify for tax-exempt status, the assets must be transferred to the Baptist Memorial Health Care System. If the Health Care System does not qualify for tax-exempt status, the assets must be distributed to the State Baptist Conventions of Arkansas, Mississippi and Tennessee.

The College was founded by the Mississippi, Arkansas and Tennessee Baptist Conventions. It receives financial support from both the Hospital and the Corporation. The College recruits students in Baptist newspapers in seven states. It also recruits students at the State Baptist Conventions in Mississippi, Arkansas and Tennessee.

The mission statement of the College provides that the College "is an outgrowth of the mission of Baptist Memorial Hospital, which is based on the three-fold ministry of Christ: preaching, teaching, and healing." *JA 386.* The motto of the College, which is incorporated in its seal, is "higher education with a higher purpose." *JA 391, 920.* The seal displays two hands representing service and scholarship on a Bible adjacent to a branch representing the tree of knowledge. *JA 391.* The College informs students of its Christian mission and its relationship with Baptist principles at orientations and open houses. Students are required to take three hours of religious studies, and to dress in a manner "that reflect[s] Christian principles of appropriateness." *JA 408.* The College holds prayer breakfasts and plans numerous chapel programs led by local Baptist ministers. It has served as host for the World Changers, a mission organization sponsored by the Southern Baptist Convention.

On August 7, 1995, the College hired Glynda Hall as a Student Services Specialist. As a Student Services Specialist, Hall worked with students and the administration in organizing and planning activities of various campus student organizations. Hall was responsible for interpreting school policies and ensuring that all student activities were consistent with the mission of the College. *JA 1106.* She was required to work with the Christian student organization, coordinating its involvement with the Tennessee Baptist Convention student ministries department. This duty necessitated her attendance at meetings of the Tennessee Baptist Convention.

It is undisputed that Hall was a good employee who received no disciplinary actions during the term of her

Convention's prohibition against the ordination of women. However, Miller was merely acting in accordance with the permissible procedures of her faith and was thus being treated no differently than any other non-Baptist who acted in accordance with the tenets of her faith. Miller was thus not similarly situated to Hall, in that she did not assume a leadership position in an organization that publicly supported homosexual lifestyles.

In addition, the First Amendment does not permit federal courts to dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices. As the district court in the instant case eloquently observed:

> In essence, [Hall] is requesting this court to tell the [College] that it must be opposed to the ordination of women with the same degree of conviction and intensity it has expressed in its opposition to the gay and lesbian lifestyle, or suffer liability under Title VII. The federal courts are not in the business of enforcing religious orthodoxy or requiring consistency and uniformity in religious beliefs or practices. If a particular religious community wishes to differentiate between the severity of violating two tenets of its faith, it is not the province of the federal courts to say that such differentiation is discriminatory and therefore warrants Title VII liability. . . .

*Hall*, 27 F. Supp. 2d at 1039-40 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 672 (1984) (citation omitted)).

Hall also contends that other similarly-situated employees were treated more favorably than she. According to Hall, the College took no employment action against two employees whom it knew were having an adulterous relationship, contrary to Southern Baptist principles. This argument is meritless. As with Cynthia Miller, Hall has not established that the two employees assumed leadership positions in organizations supporting homosexual lifestyles. The

1241, 1246 (6th Cir. 1995). If the plaintiff makes a *prima facie* case, a presumption of discrimination arises. In order to overcome this presumption, the defendant must articulate a legitimate nondiscriminatory reason for the plaintiff's termination. *Id.* If the defendant can do so, the burden shifts back to the plaintiff to prove that the articulated reason was merely a pretext for the real reason, unlawful discrimination. *Id.*

It is undisputed that Hall is a member of a protected class (a member of Holy Trinity Community Church), that she was qualified for her position as a Student Services Specialist at the College, and that she suffered an adverse employment decision. Hall has not alleged that she was replaced by someone outside the protected class; thus, our *de novo* review focuses on whether Hall has shown that she was treated less favorably than similarly-situated persons not a member of the protected class. In other words, Hall has the burden of establishing that comparable co-workers who engaged in substantially the same conduct as she were treated better. *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 661 (6th Cir. 1999) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

The district court found that Hall did not show that any similarly-situated non-protected employee had received more favorable treatment by the College. In the words of the district court, Hall did not show, for example, that the College "had ever treated an employee who assumed a leadership position in an organization expressing public support for homosexuals and the homosexual lifestyle any differently than it treated her." *Hall v. Baptist Memorial Health Care Corp.*, 27 F. Supp. 2d 1029, 1038 (W.D. Tenn. 1998).

On appeal, Hall argues that another employee, Cynthia Miller, was similarly situated to Hall but treated more favorably. Miller became an ordained minister in the Christian Methodist Episcopal Church, but was allowed to continue her employment despite the Southern Baptist

employment. On June 4, 1996, she was given a performance evaluation with all "exemplary" and "accomplished" scores. *JA 876-85.* On June 27, 1996, she received a letter extending her contract through 1997, along with a raise.

In the spring of 1996, Hall began the process of becoming a lay minister at Holy Trinity Community Church ("Holy Trinity") -- a church she had been attending since February 1995. According to Hall, Holy Trinity is a non-denominational Christian church that reaches out to all persons seeking a relationship with Jesus Christ. The congregation includes many gay and lesbian members, including Hall. Holy Trinity teaches that there is nothing inherently inconsistent between the homosexual lifestyle and Christianity. It solicits homosexual members through advertisements in *Second Stone*, a national publication for gay, lesbian and bisexual Christians.

The Southern Baptist Convention is outspoken against homosexual lifestyles. Its formal resolution on the issue of homosexuality states that the Convention "deplores homosexuality as a perversion of divine standards and as a violation of nature and natural affections." *JA 310.* Moreover, "while God loves the homosexual and offers salvation, homosexuality is not a normal lifestyle and is an abomination in the eyes of God." *Id.*

In the summer of 1996, Dr. Paul Barkley, a Southern Baptist minister and Hall's supervisor, asked Hall where she attended church. She informed him that she attended Holy Trinity. Because of Barkley's suspicion that Holy Trinity condoned homosexual lifestyles and the Southern Baptist Convention's clear denunciation of such alternative lifestyles, he informed the College president, Dr. Rose Temple, about Hall's attendance there. Temple told Barkley that the College would not intervene in Hall's choice of where to attend church.

On September 15, 1996, Hall was ordained as a lay minister at Holy Trinity. Hall did not invite Barkley to her ordination ceremony because she feared she would be fired if Barkley discovered she was a lesbian and that Holy Trinity welcomed homosexual members. Shortly after her ordination, however, she informed Barkley that she was a lesbian. Hall brought Barkley a copy of *Second Stone* to show him that there were a number of churches and denominations that welcomed and supported the gay and lesbian community. She showed him an advertisement in the newspaper for Holy Trinity.

Barkley relayed this information and the newspaper to Temple. Temple testified that she perceived Hall's position at the College to be one of considerable influence over students, that Holy Trinity's views on homosexuality were inconsistent with those of the Southern Baptist Convention and thus the College, and that this inconsistency created a conflict of interest. Accordingly, on November 20, 1996, Temple asked Hall to resign. Temple told Hall that if she would agree to resign, Temple would help her obtain another more appropriate position within the College, the Hospital or the Health Care Corporation for which she was qualified. Hall refused this offer and the College terminated her for a "conflict of interest." The termination took place on December 3, 1996.

Hall filed a complaint with the EEOC on January 16, 1997, and was issued a right-to-sue letter on December 5, 1997. She subsequently filed a complaint alleging employment discrimination based on religious grounds in the Western District of Tennessee on January 14, 1998. Cross motions for summary judgment were filed by the parties. On November 23, 1998, the district court granted summary judgment in favor of the College and dismissed the case. Hall filed a timely appeal from the district court's decision.

Hall raises three issues on appeal: (1) whether the district court erred in finding that the College was a religious institution entitled to an exemption from Title VII's

at 1345 (quoting *Little*, 929 F.2d at 951). Accordingly, the court in *Ward v. Hengle*, 124 Ohio App. 3d 396, 400 (1997), held that the trial court need not even determine whether a church waived its Title VII exemption from religious discrimination claims based on a statement in its employment handbook that it would not discriminate against its personnel on the basis of religion. *See also Siegel*, 13 F. Supp. 2d at 1344 (government funds are most likely available to all institutions of higher learning whether or not they have a religious affiliation).

For these reasons, the district court did not err in determining that the College was exempt from the Title VII prohibition against discrimination based on religion.

### B.

Hall also argues that the district court erred in finding that she failed to establish her *prima facie* case or that she failed to prove that the College's articulated reason for firing her was pretextual. A plaintiff may prove discrimination under Title VII through direct or circumstantial evidence. In the absence of direct evidence of discrimination, a plaintiff must establish its case under the framework first enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992).

The *McDonnell Douglas* framework consists of three stages. First, the plaintiff must establish a *prima facie* case of discrimination. In order to establish her *prima facie* case, Hall must show that (1) she is a member of a protected group; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated less favorably than a similarly-situated employee outside the protected class. *McDonnell Douglas*, 411 U.S. at 802; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981); *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d

Corporation. Thus, the College has a direct relationship with the Baptist church.

The College atmosphere is permeated with religious overtones. It recruits students in Baptist publications and at Baptist Conventions. Prospective students are informed of the religious mission of the College at open houses. Incoming students are informed of this mission at orientation. The College seal includes a picture of the Bible and the words "higher education with a higher purpose." All students are required to take three hours of religious studies and must comply with a dress code that reflects "Christian principles of appropriateness." *JA 408.* The College holds numerous prayer breakfasts and chapel programs. It has held several commencements at Baptist churches and hosted Baptist-sponsored programs. The fact that the College trains its students to be nurses and other health care professionals does not transform the institution into one that is secular. *See, e.g., Mississippi College,* 626 F.2d 477 (four-year co-educational liberal arts college owned and operated by the Mississippi Baptist Convention is a "religious educational institution"); *Siegel v. Truett-McConnell College, Inc.*, 13 F. Supp. 2d 1335 (N.D. Ga. 1994) (private co-educational college of liberal arts and sciences founded by the Georgia Baptist Convention is a "religious educational institution" under Title VII).

Hall contends that even if the College is a religious educational institution, it waived the Title VII exemption for such institutions because it represented itself as being an equal opportunity employer and because it received federal funds. However, the statutory exemptions from religious discrimination claims under Title VII cannot be waived by either party. *Little*, 929 F.2d at 951; *Siegel*, 13 F. Supp. 2d at 1345. The exemptions reflect a decision by Congress that religious organizations have a constitutional right to be free from government intervention. *Id.* "Once Congress stated that '[t]his title shall not apply' to religiously-motivated employment decisions by religious organizations," neither party could expand the statute's scope. *Siegel,* 13 F. Supp. 2d

prohibition against religious discrimination; (2) whether the district court erred in finding that the statutory Title VII exemption was not waivable; and (3) whether the district court erred in finding that Hall did not state a *prima facie* case of religious discrimination, and in finding that the College's proffered nondiscriminatory reason was not pretextual.

## II.

Summary judgments are reviewed *de novo*. *E.E.O.C. v. University of Detroit,* 904 F.2d 331, 334 (6th Cir. 1990). The College has the initial burden to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S 317, 327 (1986). If the College meets that requirement, the burden shifts to Hall to present sufficient admissible evidence on which a jury could return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## A.

Title VII of the 1964 Civil Rights Act states that it shall be an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin. . . ." 42 U.S.C. § 2000e-2(a). In recognition of the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions, however, Title VII has expressly exempted religious organizations from the prohibition against discrimination on the basis of religion:

This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). Another, more specific exemption applies only to religious educational organizations:

> It shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire an employee of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole, or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed towards the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2).

The decision to employ individuals "of a particular religion" under § 2000e-1(a) and § 2000e-2(e)(2) has been interpreted to include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer. *See, e.g., Little v. Wuerl*, 929 F.2d 944, 951 (3rd Cir. 1991); *Killinger v. Samford Univ.*, 113 F.3d 196, 198 (11th Cir. 1997). In *Little*, for example, the court concluded that the Title VII exemption included the decision of a parochial school to terminate a tenured Protestant teacher who had failed to validate her second marriage by first seeking an annulment of her previous marriage through the proper canonical procedures of the Catholic church. 929 F.2d at 951. Similarly, in *Killinger*, the court concluded that the Title VII exemption included the decision of a Baptist university to remove a Baptist faculty member from his teaching position because his religious beliefs differed from those of the dean. 113 F.3d at 198.

Hall argues on appeal that the district court erred in finding that the College was a "religious educational institution" entitled to the Title VII exemption from religious discrimination claims. There is no Sixth Circuit precedent on

point. In determining whether the College qualifies for the statutory exemption, the court must look at all the facts to decide whether the College is a religious corporation or educational institution. *Killinger,* 113 F.3d at 198-99. It is appropriate to consider and weigh the religious and secular characteristics of the institution. *E.E.O.C. v. Townley Eng'g & Mfg.Co.,* 859 F.2d 610 (9th Cir. 1988), *cert. denied*, 489 U.S. 1077 (1989); *E.E.O.C. v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), *cert. denied*, 453 U.S. 912 (1981).

In this case, the district court properly weighed the facts and identified the specific religious and secular characteristics of the College. Based on that analysis, the district court concluded that the College had set forth sufficient evidence to support its characterization of the College as a religious educational institution. We agree.

The College qualifies for the exemption under the plain language of § 2000e-2(e)(2) because it is a "school, college, university, or other educational institution or institution of learning . . . [that] . . . is, in whole, or in substantial part, owned, supported, controlled, or managed by a . . . religious corporation." *Id.* Moreover, the record shows that the Baptists created the Health Care Corporation with the sole purpose of making the interrelated religious/service mission of the Baptists a reality. It accomplished this by authorizing the Corporation to "separately incorporate hospitals, clinics, home health care organizations, rehabilitation centers, health maintenance organizations, hospices, nursing homes, nursing and other schools. . . ." *JA 285.* The College and the Hospital are mere examples of those facilities.

The College was founded by three sectarian organizations: the Mississippi, Arkansas and Tennessee Baptist Conventions. It is a subsidiary of the Hospital which is a subsidiary of the Health Care Corporation, and it receives funds from both the Hospital and the Corporation. The "preaching, teaching, and healing" mission of the College is subsumed in the missions of the Hospital and the