929 F.2d 944
 55 Fair Empl.Prac.Cas. 786,
56 Empl. Prac. Dec. P 40,671, 59 USLW 2608,
66 Ed. Law Rep. 966
 Susan Long LITTLE, Appellant,
v.
Donald P. WUERL, Bishop of Pittsburgh, as Trustee of St.
Mary Magdalene School, and as Titular Head of the
Catholic Diocese of Pittsburgh St. Mary
Magdalene Parish.
 No. 90-3379.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 15, 1990.
Decided April 3, 1991.
 
 Jay N. Silberblatt (argued), Sikov and Love, P.A., Pittsburgh, Pa., for appellant.
 Philip J. Murren (argued), Maura K. Quinlan, Ball, Skelly, Murren & Connell, Harrisburg, Pa., Linda S. Drago, Diocese of Pittsburgh Legal Office, Pittsburgh, Pa., for appellee.
 Before STAPLETON, HUTCHINSON and GARTH, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 Susan Long Little, a Protestant teacher, claims that St. Mary Magdalene Parish ("the Parish"), operator of a Roman Catholic school, violated Title VII's prohibition against religious discrimination when it failed to renew her contract because of her remarriage. We find this claim to be without merit and will affirm the district court's judgment. 739 F.Supp. 1003.
 
 
 2
 Congress has exempted religious institutions from much of Title VII's prohibition against employment discrimination on the basis of religion. Specifically, that prohibition does not apply to religious organizations "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [an organization] of its activities." 42 U.S.C. Sec. 2000e-1. This exemption clearly makes Title VII inapplicable to Catholic schools when they discriminate by hiring and retaining Catholics in preference to non-Catholics. This case raises the more difficult question of whether Title VII applies to a Catholic school that discriminates against a non-Catholic because her conduct does not conform to Catholic mores. Because applying Title VII in these circumstances would raise substantial constitutional questions and because Congress did not affirmatively indicate that Title VII should apply in situations of this kind, we interpret the exemption broadly and conclude that Title VII does not apply.
 
 
 3
 This is a federal question case arising under the Constitution and the Civil Rights Act of 1964, and we have appellate jurisdiction over the district court's judgment pursuant to 28 U.S.C. Sec. 1291. Our review of grants of summary judgment is plenary. Hankins v. Temple University, 829 F.2d 437, 440 (3d Cir.1987).
 
 I.
 
 4
 Little served as an elementary school teacher from 1977 to 1986, and was granted a leave of absence for the 1986-87 school year. The Parish hired her with full awareness that she was a Protestant. While Little was not given responsibility for teaching religion, she attended Catholic ceremonies with her pupils and participated in the school's programs for teachers that were intended to strengthen their ability to impart "Catholic" values to students. As a tenured teacher, Little reasonably expected that her annual employment contract would be renewed each year in the absence of just cause. There is no dispute that Little performed well as a teacher.
 
 
 5
 The annual employment contracts between Little and the Parish, the same form contract used by all schools and teachers in the Diocese, contained a Cardinal's Clause. That clause reads:
 
 
 6
 Teacher recognizes the religious nature of the Catholic School and agrees that Employer has the right to dismiss a teacher for serious public immorality, public scandal, or public rejection of the official teachings, doctrine or laws of the Roman Catholic Church, thereby terminating any and all rights that the Teacher may have hereunder, subject, however, to the personal due process rights promulgated by the Roman Catholic Church.
 
 
 7
 Contract at p 6, Appendix at 172a. The employment contract also defined cause for termination to include "failure to perform in accordance with the terms and conditions of this contract as stated herein and in the Handbook of Personnel Policies and Practices ..."
 
 
 8
 Little acknowledges that she received the Handbook. The specific reference to the Handbook in Little's contract is significant because the Handbook includes the following gloss on the Cardinal's clause:
 
 9.5 Just Cause Termination
 
 9
 One example of termination for just cause is a violation of what is understood to be the Cardinal's Clause. The Cardinal's Clause requires the dismissal of the teacher for serious public immorality, public scandal or public rejection of the official teachings, doctrine or laws of the Catholic Church. Examples of the violation of this clause would be the entry by a teacher into a marriage which is not recognized by the Catholic Church, or the support of activities which espouse beliefs contrary to Church teaching, e.g. advocacy of a practice such as abortion.
 
 Appendix at 195 (emphasis added).[1]
 
 10
 The parties agree that the Parish took very seriously its mission to be a Catholic presence in a secular world. This is underscored by the fact that the Diocese of Pittsburgh changed its policy in 1984 to favor hiring only Catholics and to require that any school hiring a non-Catholic get special permission. The policy change did not apply to teachers such as Little, who were already employed, and Little makes no claim that it influenced the Parish's decision not to renew her contract.
 
 
 11
 Little was married when she was hired, having been married in a Protestant religious ceremony. However, she was divorced in 1979 and was remarried by a Justice of the Peace in August 1986, the beginning of her leave of absence. Little's second husband, while not a practicing member of any religion, was baptized in the Catholic Church. Absent public repudiation of the affiliation or formal membership in another church, the Catholic Church considers all baptized Catholics to remain Catholic. Catholic canon law "recognizes" marriages performed by other Christian denominations if the parties are free to marry in the eyes of the Catholic Church (i.e. have not been married before). Catholic canon law also allows non-Catholics to seek annulments of their prior marriages from the Catholic Church on the same terms as Catholics.
 
 
 12
 When she tried to renew her contract for the 1987-88 year, Little was informed that she would not be rehired. The parties have stipulated that Little was not rehired "because she had remarried ... without pursuing the 'proper canonical process available from the Roman Catholic Church to obtain validation of her second marriage.' " Stipulation p 13, Appendix at 53a. Little does not challenge the sincerity of the Parish's asserted religious doctrine. The Parish's pastor testified:
 
 
 13
 I consider Susan Little's action in publicly rejecting the doctrine and laws of the Church by marrying a Catholic without proper validation to be a serious contradiction of the Church's teachings and laws on the indissolubility of Christian marriage and the sacramental nature of the marriage bond.
 
 
 14
 Appendix at 110. The Parish credibly asserts that it also would not have rehired a Catholic who had entered into a canonically invalid marriage. Appendix at 41a, 110a.
 
 
 15
 Little received a right-to-sue letter from the EEOC on March 8, 1989 and filed this action on May 18, 1989. After substantial discovery, the parties stipulated to most of the facts and filed cross motions for summary judgment. The district court granted the Parish's summary judgment motion, finding that the religious organization exemption to Title VII covered the Parish's decision.
 
 II.
 
 16
 The Supreme Court has stressed that constitutional issues should be avoided whenever possible:[T]he question we consider first is whether Congress intended the [National Labor Relations] Board to have jurisdiction over teachers in church-operated schools. In a number of cases the Court has heeded the essence of Mr. Chief Justice Marshall's admonition in Murray v. The Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804), by holding that an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available....
 
 
 17
 In keeping with the Court's prudential policy it is incumbent on us to determine whether the Board's exercise of its jurisdiction here would give rise to serious constitutional questions. If so, we must first identify "the affirmative intention of Congress clearly expressed" before concluding that the Act grants jurisdiction.
 
 
 18
 NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500-01, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979). In Catholic Bishop, the Court was able to avoid the constitutional issue because Congress had expressed no clear intention that the National Labor Relations Board was to have jurisdiction over religious schools. Following a similar analysis, the Court of Appeals for the Fifth Circuit reached the constitutionality of applying Title VII to ministers only after finding that Congress specifically intended Title VII to forbid race and sex discrimination by religious groups. McClure v. Salvation Army, 460 F.2d 553 (5th Cir.), cert. denied, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972).
 
 
 19
 Following the teachings of Catholic Bishop, we first consider whether applying Title VII to the Parish's decision in this case would raise substantial constitutional questions. If it would, we next determine whether Congress clearly expressed an intent that Title VII be applied to this kind of decision.
 
 III.
 
 20
 Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2 ("Title VII"), prohibits employers from discriminating on the basis of religion.[2] Application of this prohibition to the Parish's decision would be constitutionally suspect because it would arguably violate both the free exercise clause and the establishment clause of the first amendment.[3]
 
 A.
 
 21
 The Parish's free exercise rights are the more obviously endangered:
 
 
 22
 Each person's right to believe as he wishes and to practice that belief according to the dictates of his conscience so long as he does not violate the personal rights of others, is fundamental to our system. Sherbert v. Verner, 374 U.S. 398, 402-03 [83 S.Ct. 1790, 1793, 10 L.Ed.2d 965] (1963). This basic freedom is guaranteed not only to individuals but also to churches in their collective capacities, which must have "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952).
 
 
 23
 Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164, 1167 (4th Cir.1985), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). Relying on this basic principle, courts have consistently found that Title VII does not apply to the relationship between ministers and the religious organizations that employ them, even where discrimination is alleged on the basis of race or sex. McClure, supra; Rayburn; supra.
 
 
 24
 Title VII has been interpreted to bar race and sex discrimination by religious organizations towards their non-minister employees. But attempting to forbid religious discrimination against non-minister employees where the position involved has any religious significance is uniformly recognized as constitutionally suspect, if not forbidden. EEOC v. Mississippi College, 626 F.2d 477 (5th Cir.1980), cert. denied, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); Maguire v. Marquette University, 627 F.Supp. 1499 (E.D.Wis.1986), aff'd in part, vacated in part, 814 F.2d 1213 (7th Cir.1987);[4] Feldstein v. Christian Science Monitor, 555 F.Supp. 974 (D.Mass.1983). The religious significance of parochial schools--and their teachers in particular--is proclaimed by the Catholic Church,[5] has been recognized by the courts,[6] and is not challenged by Little.
 
 
 25
 In considering a charge of discrimination based on sex, the court in Mississippi College stated that first amendment concerns required the conclusion that:
 
 
 26
 if a religious institution ... presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion, Sec. 702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination.
 
 
 27
 626 F.2d at 485. After finding that the Christian Science Monitor was a religious activity, the court in Feldstein found the paper free to discriminate based on religion in selecting reporters; the judge stated, "I am ... unwilling to involve the federal court in what is ultimately an internal administrative matter of a religious activity." 555 F.Supp. at 978.
 
 
 28
 The Maguire case best illustrates the even graver dangers courts face when asked to rule on religious discrimination that does not follow clear denominational lines. In that sex discrimination case, a Catholic university claimed that it had refused to hire plaintiff as a theology professor because she held views on abortion that disqualified her from being a Catholic. The court properly decided that any scrutiny of that claim would violate both the free exercise and the establishment clauses.
 
 
 29
 The state, through this court, would involve itself in theological questions and then, if finding for plaintiff, impose upon the [university] the Court's judgment as to what comprises adherence to the Catholic faith.
 
 
 30
 * * * * * *
 
 
 31
 Despite [plaintiff's] protests that she is a Catholic, "of a particular religion," the determination of who fits into that category is for religious authorities and not for the government to decide.
 
 
 32
 627 F.Supp. at 1505-07.
 
 
 33
 Little makes no claim to be a Catholic. Nevertheless, if this court were to review the Parish's decision, it would be forced to determine what constitutes "the official teachings, doctrine or laws of the Roman Catholic Church" and whether plaintiff has "rejected" them.
 
 B.
 
 34
 Application of Title VII's prohibition against religious discrimination to the Parish's decision would also be suspect because it arguably would create excessive government entanglement with religion in violation of the establishment clause. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Supreme Court has recognized that the establishment clause limits government interference in the relationship between parochial schools and their teachers. The Court has prohibited state aid to parochial schools because the regulation necessary to assure that the aid would promote only secular education would result in excessive government supervision of religious education. Lemon, 403 U.S. at 615-22, 91 S.Ct. at 2112-16. The Court has also concluded that National Labor Relations Board jurisdiction over parochial school employees raises a sufficient risk of entanglement that there should be a presumption against such jurisdiction. NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 501-04, 99 S.Ct. 1313, 1319-21, 59 L.Ed.2d 533 (1979).
 
 
 35
 Federal court oversight of the Parish's decision in this case raises the type of constitutional concerns identified in Catholic Bishop. In that case, the Supreme Court noted:
 
 
 36
 [t]he resolution of such [unfair labor practice] charges by the Board, in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.
 
 
 37
 440 U.S. at 502, 99 S.Ct. at 1320. In this case, the inquiry into the employer's religious mission is not only likely, but inevitable, because the specific claim is that the employee's beliefs or practices make her unfit to advance that mission. It is difficult to imagine an area of the employment relationship less fit for scrutiny by secular courts. Even if the employer ultimately prevails, the process of review itself might be excessive entanglement. As one commentator notes,
 
 
 38
 Quite apart from whether a regulation requires a church or an individual believer to violate religious doctrine or felt moral duty, churches have a constitutionally protected interest in managing their own institutions free of government interference.
 
 
 39
 Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right of Church Autonomy, 81 Colum.L.Rev. 1373, 1373 (1981).
 
 
 40
 In short, interpreting Title VII's prohibition of religious discrimination to apply to the Parish's decision would raise serious constitutional questions under both the free exercise and the establishment clauses. Accordingly, we will do so only if Congress clearly intended that result.
 
 IV.
 
 41
 In enacting Title VII, Congress clearly asserted a strong government interest in eliminating religious discrimination in employment. In fact, Congress felt that interest to be so strong that Title VII requires employers to "reasonably accommodate" employees religious practices unless they can demonstrate that such accommodation would be an "undue hardship." 42 U.S.C. Sec. 2000e(j).
 
 
 42
 But Congress also recognized that religious groups have a constitutionally protected interest in applying religious criteria to at least some of their employees; for example, a religious organization has an obvious need to employ a member of its own denomination as minister. Therefore, Title VII has always contained some sort of exception to allow religious organizations to discriminate on the basis of religion. As originally enacted the exception covered:
 
 
 43
 a religious corporation, association, or society with respect to employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association or society of its religious activities or to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution.
 
 
 44
 42 U.S.C. Sec. 2000e-1 (1970). In 1972, that exception was broadened to cover non-religious activities by the same groups.
 
 
 45
 a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.
 
 
 46
 42 U.S.C. Sec. 2000e-1 (Supp. II 1972).
 
 
 47
 Another, similar exemption from Title VII, Sec. 703(e)(1), applies only to religious educational organizations:
 
 
 48
 it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such [institution] is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such [institution] is directed toward the propagation of a particular religion.
 
 
 49
 42 U.S.C. Sec. 2000-2(e)(1).
 
 
 50
 The difficulty in determining whether these exceptions apply to the Parish's decision not to rehire Little lies in determining what it means for someone to be "of a particular religion." Little can plausibly claim that she is, and always has been, a Protestant and that because her religious affiliation never changed, the Parish's decision not to rehire her cannot have been based upon whether she was "of a particular religion." The Parish can respond that being "of a particular religion" involves more than denominational affiliation, that it includes conduct considered by the employer or the employee to have religious significance.
 
 
 51
 Section 701(j) of Title VII, which applies to both exemptions, defines religion broadly:
 
 
 52
 The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of employer's business.
 
 
 53
 42 U.S.C. Sec. 2000e(j). But, taken as a whole, the definition seems intended to broaden the prohibition against discrimination--so that religious practice as well as religious belief and affiliation would be protected. There appears to be no legislative history to indicate that Congress considered the effect of this definition on the scope of the exemptions for religious organizations.
 
 
 54
 Although the legislative history never directly addresses the question of whether being "of a particular religion" applies to conduct as well as formal affiliation, it suggests that the sponsors of the broadened exception were solicitous of religious organizations' desire to create communities faithful to their religious principles. One sponsor claimed that:
 
 
 55
 the establishment of church-related educational institutions is the embodiment of the free exercise of religion. This form of religious activity has always been recognized to occupy the same high estate under the first amendment as worshipping in the churches and preaching from the pulpits.
 
 
 56
 118 Cong.Rec. 1994 (1972) (Senator Allen). Another sponsor made it clear that the exception was intended to remove religious employers from government scrutiny:
 
 
 57
 [Question]: Does the Senator's amendment limit itself to the opportunity of a religious organization to have the right to hire people of its own faith? Is that the limitation of the amendment?
 
 
 58
 Senator Ervin: I would allow the religious corporation to do what it pleased. That is what my amendment would allow it to do. It would allow it liberty. It would take it out from under the control of the EEOC entirely.
 
 
 59
 118 Cong.Rec. 1982 (1972).
 
 
 60
 The broadening of the exception to cover all employees rather than only those engaged in "religious activities" was done at the same time Congress eliminated a general exception from Title VII for all educational establishments. It is generally acknowledged that "[t]he sponsors of the 1972 exemption were chiefly concerned to preserve the statutory power of sectarian schools and colleges to discriminate on religious grounds in the hiring of all their employees." King's Garden, Inc. v. Federal Communications Comm'n, 498 F.2d 51, 54 (D.C.Cir.), cert. denied, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); see also Comment, "Corporation of Presiding Bishop v. Amos": The Supreme Court and Religious Discrimination by Religious Educational Institutions, 3 Notre Dame J.L. Ethics & Pub. Pol'y 629, 662 (1988); Note, Religious Discrimination and the Title VII Exemption for Religious Organizations: A Basic Values Analysis for the Proper Allocation of Conflicting Rights, 60 S.Cal.L.Rev. 1375, 1383 (1987).
 
 
 61
 We recognize that Congress intended Title VII to free individual workers from religious prejudice. But we are also persuaded that Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's "religious activities." Against this background and with sensitivity to the constitutional concerns that would be raised by a contrary interpretation, we read the exemption broadly. We conclude that the permission to employ persons "of a particular religion" includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts. Thus, it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic or a non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles. We therefore hold that the exemptions to Title VII cover the Parish's decision not to rehire Little because of her remarriage.
 
 V.
 
 62
 Little argues that even if the Parish's decision is exempted from Title VII, the Parish waived those exemptions when it knowingly hired a Protestant. This argument incorrectly views the exemptions for religious schools as a privilege or interest granted to those organizations.[7] Instead, those exemptions reflect a decision by Congress that the government interest in eliminating religious discrimination by religious organizations is outweighed by the rights of those organizations to be free from government intervention. Once Congress stated that "[t]his title shall not apply" to religiously-motivated employment decisions by religious organizations, no act by Little or the Parish could expand the statute's scope.
 
 VI.
 
 63
 We conclude that the application of Title VII's prohibition against religious discrimination to the Parish's decision not to rehire Little would raise substantial constitutional questions. We further determine that neither Title VII's plain language, nor its legislative history, demonstrates Congress' affirmative intent that Title VII apply here. Therefore, we hold that Little has no Title VII claim against the Parish, and we will affirm the judgment.
 
 
 
 [1]
 At oral argument, Little's counsel conceded that "pro-choice" advocacy would be grounds for dismissal under the contract. See also Deposition of Little, Appendix at 306-309a (stating Cardinal's Clause would prohibit advocating non-Catholic views to her students)
 
 
 [2]
 "It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; ..." 42 U.S.C. Sec. 2000e-2(a)
 
 
 [3]
 The first amendment to the Constitution reads in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ..."
 
 
 [4]
 The court of appeals upheld the dismissal of plaintiff's Title VII case without reaching the issue of Title VII's scope, because it found plaintiff had failed to make a prima facie case of sex discrimination
 
 
 [5]
 "The integration of religious truth and values with the rest of life is brought about in the Catholic school not only by its unique curriculum but, more important, by the presence of teachers who express an integrated approach to learning and living in their private and professional lives." To Teach as Jesus Did, National Conference of Catholic Bishops (1972), Appendix at 138
 
 
 [6]
 "In recent decisions involving aid to parochial schools we have recognized the critical and unique role of the teacher in fulfilling the mission of a church-operated school." NLRB v. Catholic Bishop, 440 U.S. at 501, 99 S.Ct. at 1319
 
 
 [7]
 The six cases Little uses to support her argument demonstrate her misunderstanding of the principle of waiver. Four cases are irrelevant because they involve waiver of private rights, either objection to personal jurisdiction or contract rights. Weisbart v. First National Bank, 568 F.2d 391, 396 (5th Cir.1978) (waiver of security interest); McCoy v. Siler, 205 F.2d 498, 499 (3d Cir.), cert. denied, 346 U.S. 872, 74 S.Ct. 120, 98 L.Ed. 380 (1953) (waiver of objection to venue); Marshall v. Mole Constructors, 193 F.Supp. 617, 618 (W.D.Pa.1961) (waiver of objection to venue); Rockwell v. United States Fidelity and Guaranty Co., 137 F.Supp. 317, 318 (M.D.Pa.1955) (waiver of objection to personal jurisdiction)
 Watkins v. United States Army, 875 F.2d 699 (9th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990), also does not apply, because in that case the army was found to have waived its own regulations. Unlike the scope of federal statutes, an employer's own employment criteria are something that the employer undoubtedly has the power to control. Finally, the Lodge in Commonwealth Human Relations Commission v. Loyal Order of Moose, 448 Pa. 451, 294 A.2d 594, appeal dismissed, 409 U.S. 1052, 93 S.Ct. 557, 34 L.Ed.2d 506 (1972), did not waive the exception for "distinctly private" facilities from the discrimination laws; by opening its dining facilities to the public, the Lodge ceased to be a "distinctly private" facility. Therefore Loyal Order demonstrates not that the Parish can waive the religious school exceptions, but only that if the Parish ceases to be a religious school, it will no longer qualify for those exceptions.