Michele **CURAY–CRAMER**, Plaintiff,

v.

The **URSULINE ACADEMY OF WILMINGTON, DELAWARE, INC.**, a Delaware corporation, **Michael A. Saltarelli, Catholic Diocese of Wilmington, Inc.**, a Delaware corporation, **Barbara C. Griffin**, and **Jerry Botto**, Defendants.

No. CIV.A. 03–1014–KAJ.

United States District Court, D. Delaware.

Nov. 16, 2004.

Thomas Stephen Neuberger, Esquire, Wilmington, DE, for Plaintiff.

Barry M. Willoughby, Esquire; Timothy Jay Houseal, Esquire; Michael P. Stafford, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Defendants, The Ursuline Academy of Wilmington, Delaware, Inc., Barbara C. Griffin and Jerry Botto.

Stephen E. Jenkins, Esquire, Ashby & Geddes, Wilmington, DE, for Defendants Catholic Diocese of Wilmington, Inc. and Bishop Michael A. Saltarelli, Of Counsel: Anthony R. Picarello, Jr., Esquire; Roman P. Storzer, Esquire; Jared N. Leland, Esquire, The Becket Fund for Religious Liberty, Washington, DC.

### MEMORANDUM OPINION

JORDAN, District Judge.

## I. *Introduction*

This case was filed by a former teacher in a Catholic girls' school who was fired after she lent her name to an advertisement in support of abortion rights. Michele Curay–Cramer (the "Plaintiff"), alleges various claims of discrimination under Title VII, as well as state law claims for defamation, invasion of privacy, and tortious interference with contractual relations. (Docket Item ["D.I."] 1 at ¶¶ 135–314.) Before me are two motions to dismiss (the "Motions"), one (D.I.10) filed by The Ursuline Academy of Wilmington, Delaware, Inc. ("Ursuline" or the "School"), Barbara C. Griffin, the President of Ursuline ("Griffin"), and Jerry Botto, the school's Director of Communications ("Botto"), and the other (D.I.11) filed by the Catholic Diocese of Wilmington, Inc. (the "Diocese") and the Bishop of the Diocese, Michael A. Saltar-

elli ("Bishop Saltarelli" or the "Bishop").[1] For the reasons stated herein, the Motions will be granted.

## II. Background [2]

Ursuline is a private school in Wilmington, Delaware that provides a college preparatory education for girls and young women from pre-kindergarten through grade twelve. (D.I. 1 at ¶ 8.) The School is not owned by the Diocese, but, as the Plaintiff has acknowledged, it teaches religious principles of the Roman Catholic Church and indoctrinates its students according to those principles. (*See id.* at ¶ 30.) Its expectation, as the Plaintiff has also acknowledged, is that the School's teachers will teach those religious principles and inculcate them in their students. (*See id.* at ¶¶ 29–30.) [3]

In June of 2001, the Plaintiff took a job teaching English and religion classes at Ursuline. (*Id.* at ¶ 25.) While still on the faculty a year and a half later, she joined with many others on the thirtieth anniversary of the United States Supreme Court's landmark decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to publish an advertisement in the *Wilmington News Journal* (the "*News Journal*") in support of abortion rights. (*See* D.I. 1 at ¶¶ 38, 63–73.) The *News Journal* is a newspaper of general circulation in the same community that Ursuline serves. (*See id.* at ¶ 38.) The advertisement, which appeared on January 22, 2003, said the following:

> Thirty years ago today, the U.S. Supreme Court in *Roe v. Wade* guaranteed a woman's right to make her own reproductive choices. That right is under attack. We, the undersigned individuals and organizations, reaffirm our commitment to protecting that right. We believe that each woman should be able to continue to make her own reproductive choices, guided by her conscience, ethical beliefs, medical advice and personal circumstances. We urge all Delawareans and elected officials at every level to be vigilant in the fight to ensure that women now and in the future have the right to choose.

**1.** Ursuline, Griffin, Botto, the Bishop, and the Diocese are referred to collectively as the "Defendants".

**2.** The following background information is drawn from the Plaintiff's Complaint (D.I.1) and does not constitute findings of fact. I am bound to accept well-pleaded, relevant factual allegations as true for purposes of deciding the Motions, *see infra* at n. 3 and 7–8, but I note that there is emphatic disagreement with the truth of much of what the Plaintiff has alleged in her 314 paragraph Complaint. (*See* D.I. 16 at 6.)

**3.** The Plaintiff claims that Ursuline is "not organized for any religious purpose whatsoever." (D.I. 1 at ¶ 8.) Of course, to believe that conclusory assertion, one must accept the patently absurd premise that the inculcation of Roman Catholic doctrine is not a religious purpose. It is particularly strange to see the Plaintiff alleging that Ursuline is a "secular corporation" with no religious purpose, when, in the very same paragraph, the Plaintiff also alleges that Ursuline is the "agent of defendants Saltarelli and the Catholic Diocese of Wilmington, Inc." (*See id.* at ¶ 8; *see also id.* at ¶ 118.) At this stage, I am required to accept as true the facts that the Plaintiff pleads, but I am not bound to accept her illogical conclusions. Nor am I bound to draw the conclusion that the School is "secular" or non-religious in character from the fact that it is not owned by the Diocese. (*See id.*) In cases such as this, where the Religion Clauses of the Constitution are at issue (*see infra* at 12–17), "[i]t is the suffusion of religion into the curriculum and the mandate of the faculty to infuse the students with the religious values of a religious creed which create the conflict with the Religion Clauses and not the vesting of legal title or the responsibility of operation." *NLRB v. Bishop Ford Cent. Catholic High Sch.*, 623 F.2d 818, 823 (2d Cir.1980).

(*Id.;* D.I. 20 at Ex. A.) After the text, the advertisement listed the people, including the Plaintiff, who were lending their support to the sentiments expressed.

In the Plaintiff's view, the Defendants are among those responsible for attacking abortion rights. As she stated in her Complaint, "[t]he 'right' that was 'under attack' included the efforts of the defendants to reverse that Supreme Court decision [i.e., *Roe* ]. For example, defendants Ursuline, Griffin and Botto on January 22, 2003 provided a bus for over 40 students to travel to Washington, D.C. to protest the *Roe v. Wade* decision." (D.I. 1 at ¶ 39.)

By Plaintiff's own admission, she lent her name to the advertisement because she wanted to persuade Ursuline "to end its policies interfering with its female employee's [sic] right to have an abortion or to advocate the right of other employees to use that procedure." (*Id.* at ¶ 42.) According to the Plaintiff,

> [t]he messages and ideas she was communicating to her employer by signing the ad were several. (a) It did not have the right to discriminate against women anymore. (b) It should start a dialog with plaintiff over the rights of pregnant women. (c) It should stop being so certain of the correctness of its position which interferes with a woman's legal, medical and personal right to make her own choices consistent with her own conscience. (d) It should end policies which interfere with access to or advocacy of abortion.

(*Id.* at ¶ 45.) In short, the Plaintiff wanted to refute the Catholic Church's categorical opposition to abortion and she wanted to do so in a public way that would allow her "to address an audience which included her employer and its Roman Catholic staff

members." [4] (*See id.* at ¶¶ 44, 65.) In her later meetings with representatives of Ursuline, she affirmed that these were her purposes and intent in joining in the publication of the advertisement. (*See id.* at ¶ 46.)

The Plaintiff succeeded in getting the attention she wanted from the School, although perhaps not in the way that she wanted. The same day that the advertisement appeared in print, she was called into Griffin's office and confronted about her abortion rights position. (*Id.* at ¶ 47.) Evidently the conversation turned to the question of whether the Plaintiff would be fired. According to the Plaintiff, she asserted that she had a right to "speak out in protest in a democracy without retaliation by her employer or the loss of her job" (*id.* at ¶ 48), and that she was a volunteer for Planned Parenthood, not in Planned Parenthood's medical office but as an assistant "with mailings and booth sitting at inner city health fairs handing out pamphlets that she thought were important" (*id.* at ¶ 49). In response, Griffin stated that she would have to "consult elsewhere with someone 'from another level' about plaintiff's continued employment, meaning consult with the Roman Catholic bishop and the Diocese" (*id.* at ¶ 51). The Plaintiff alleges that Griffin, in fact, did consult with the Bishop and the Diocese and received permission to fire her. (*Id.* at ¶¶ 57–58.)

Two days later, on Friday, January 24, 2003, the Plaintiff was again summoned to Griffin's office. (*Id.* at ¶ 60.) Griffin told her that she was going to be fired but that she could resign instead, if she wished. (*Id.*) She was given the weekend to think it over. (*Id.* at ¶ 61.) The following Mon-

---

4. Although the Plaintiff avoids acknowledging it in her Complaint, it was not only the adults associated with Ursuline who could read and understand her vocal opposition to the Catholic position on abortion; the publication of her position in the *News Journal* presumably made it available to Ursuline students as well.

day, January 27, 2003, the Plaintiff returned to the School and met with Griffin and the head of Ursuline's Religion Department. (*Id.* at ¶ 63.) The Plaintiff told them it was illegal for them to fire her "for opposing practices of [Ursuline] which interfered with the legal right to an abortion." (*Id.* at ¶ 64.) She further "noted her concerns about how the Roman Catholic church treats women . . . ." (*Id.* at ¶ 65.) She denied that she had ever "said or done anything in her classroom contrary to her employer's requirements for espousing, teaching and indoctrinating Ursuline's beliefs." (*Id.* at ¶ 66.) She was told that she could keep her job if she immediately and publicly recanted her position in favor of abortion rights and if she would "say in the newspaper that she is 'pro-life.'" (*Id.* at ¶ 69.) She refused, saying that it would violate her conscience and be a lie to recant her beliefs. (*Id.* at ¶ 71.) Griffin then fired her. (*Id.* at ¶ 72.)

Later that day, Griffin gave an interview to the *News Journal* in which she discussed the firing. (*Id.* at ¶ 74.) The Plaintiff alleges that the press sought a response from her but that she initially declined to give one. (*Id.* at ¶ 76.) She changed her mind, however, and "granted the interview request to try to tell her side of the story and . . . to prevent Griffin from poisoning and shaping public opinion against her." (*Id.* at ¶ 78.) A story about the firing appeared in the newspaper on January 29, 2003, and generated further media attention. (*See id.* at ¶ 80.) The Plaintiff is silent about the source for that first story. She alleges, however, that the same day that story appeared, "Ursuline sent out a press release, inviting television, radio and print media, and announcing that there would be a press conference at the school the next day to discuss the decision to fire plaintiff." (*Id.* at ¶ 82.) According to the Plaintiff, "[t]he defendants acted maliciously, in bad faith and otherwise with evil intent" in publicizing the plaintiff's firing (*id.* at ¶ 84; *see id.* at ¶¶ 75, 79, 81), including providing private information about the discussions that had taken place within the School (*id.* at ¶¶ 88–94). When asked by media representatives why the School was publicizing the firing, Griffin responded that Ursuline was reacting to publicity generated by the Plaintiff. (*Id.* at ¶ 96.) She stated, "we are not further publicizing this . . . . We had no desire to make this into a major case." (*Id.* at ¶ 98.)

The Plaintiff alleges that defendant Botto "took it upon himself to build upon Griffin's statements, further tarnish plaintiff's reputation and further publicize the matter." (*Id.* at ¶ 102.) She points in particular to a comment Botto reportedly made to the effect that the Plaintiff "should be excommunicated from the Roman Catholic Church." (*Id.* at ¶ 103.) The Plaintiff clearly takes that comment as especially hurtful, since she views herself as "a member in good standing of the Roman Catholic Church" who has "attended many religious retreats" and has "attended a monthly spiritual advisor meeting" sponsored by a Roman Catholic group. (*See id.* at ¶ 104.)

The Plaintiff also believes that Bishop Saltarelli and the Diocese "further sought to publicize Ursuline's decision to fire" her. (*Id.* at ¶ 110.) According to the Plaintiff, the Bishop went to another local Catholic school, Archmere Academy, and spoke to a "Moral Decision–Making Class" shortly after the January 30th press conference. (*Id.* at ¶ 111.) "He told them about the circumstances surrounding plaintiff's firing by Ursuline . . . and said that he approved of the decision to fire her[,]" saying further, "that he was 'very, very pleased' with Ursuline's handling of the situation." (*Id.* at ¶ 116.)

The Plaintiff alleges that she has suffered and is continuing to suffer economic

and emotional damage as a result of the foregoing events. (*See id.* at ¶¶ 125–26.)

### III. *Standard of Review*

■ The Defendants have moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (D.I.10, 11.) In reviewing this type of motion, I am "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). I am not, however, required to consider or regard as true conclusory allegations of law, unsubstantiated conclusions, or unwarranted factual inferences. *See Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906, 906 n. 8 (3d Cir.1997) (citation omitted).

■ The moving parties bear the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991). Nevertheless, "[t]he pleader is required to 'set forth sufficient information to outline the elements of [her] claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed.1990)).

■ "[A] case should not be dismissed for failure to state a claim unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations." *Jordan,* 20 F.3d at 1261 (internal citations omitted). Thus, a motion to dismiss should be granted when, for example, there is an "insuperable barrier" to recovery. *Flight Systems, Inc. v. Electronic Data Systems Corp.,* 112 F.3d 124, 127 (3d Cir.1997) (citing *Continental Collieries v. Shober,* 130 F.2d 631, 635–36 (3d Cir.1942) ("affirmative defenses may be raised on a

12(b)(6) motion 'where the defect appears on the face of the pleading' ")); *cf. Bryce v. Episcopal Church in the Diocese of Colo.,* 289 F.3d 648, 654 (10th Cir.2002) ("If the church autonomy doctrine applies to the statements and materials on which plaintiffs have based their claims, then the plaintiffs have no claim for which relief may be granted.").

### IV. *Discussion*

The Plaintiff sets out her claims in six counts: Count I is labeled, "Title VII Opposition Clause Retaliation for Opposing Illegal Gender Discrimination" (D.I. 1 at ¶¶ 135–56); Count II is labeled, "Gender Discrimination for Advocacy and Associating with Persons Protected by Title VII and the Pregnancy Discrimination Act" (*id.* at ¶¶ 157–79); Count III is labeled, "Title VII Gender Discrimination—Credibility Case—Both Prongs of *Fuentes v. Perskie*" (*id.* at ¶¶ 180–229); Count IV is labeled, "State Law Defamation" (*id.* at ¶¶ 230–56); Count V is labeled, "State Law Invasion of Privacy" (*id.* at ¶¶ 257–82); and Count VI is labeled, "State Law Tortious Interference with Contractual Relations" (*id.* at ¶¶ 283–314). For ease of reference, the first three claims are referred to herein collectively as the "Federal Claims," and the last three claims are referred to collectively as the "State Claims."

### A. *The Federal Claims*

The Plaintiff has attempted to frame her dispute with the Defendants, at least that portion of the dispute dealing with the firing itself, as opposed to the aftermath, in terms of federal anti-discrimination statutes. In particular, she cites Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.,* and an amendment to that statute, the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), as the basis for her Federal Claims. Title VII provides, in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e–2(a). The PDA makes it clear that the sexual discrimination prohibited by Title VII includes discrimination based upon "pregnancy, child birth, or related medical conditions[.]"

See 42 U.S.C. § 2000e(k).[5] Of course, Title VII is, by its terms, focused on "unlawful employment practices." 42 U.S.C.A. § 2000e–2(a)

While the Plaintiff seeks to differentiate the claims from one another, the first two Federal Claims are based on the premise that it is unlawful under Title VII for the Defendants to terminate an employee who has an abortion or who advocates abortion rights. (See D.I. 1 at ¶¶ 138–39, 152–55, 163–65.)[6] The third of the Federal Claims, Count III in the Complaint, is directed against Ursuline and the Diocese only (see id. at ¶ 181) and is somewhat more complicated. It also asserts that abortion rights advocacy is a protected activity under Title VII, but it makes the additional allegation that Ursuline and the Diocese are notoriously prejudiced against women and that the decision to fire the Plaintiff was really rooted in that prejudice. (See, e.g., id. at ¶¶ 195, 221–26.)[7] In

---

**5.** The PDA, as codified at 42 U.S.C. § 2000e(k), reads as follows:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: Provided, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

References herein to Title VII include and are intended to refer to the PDA as well.

**6.** In Count I, Plaintiff frames the claim as one for "retaliation for legally protected opposition to discrimination against women" (D.I. 1 at ¶ 155), the discrimination being the Defendants' opposition to abortion rights and a policy of terminating the employment of those who have abortions or advocate abortion rights (see id. at ¶ 138). In Count II, she claims that her advocacy of abortion rights and her association with groups advocating abortion rights are protected by Title VII and, therefore, that the decision to terminate her for those advocacy and association choices is actionable. (See id. at ¶¶ 163–65.)

**7.** The Plaintiff alleges four "alternative" bases for liability in Count III. First, she claims that she was a qualified religion teacher and, after she was fired she was replaced with a male religion teacher. (D.I. 1 at ¶ 186.) Second, she says that the decision to fire her was based on her gender and that "male teachers or staff of Ursuline have committed offenses of similar or comparable seriousness to that of plaintiff and they have not been discharged." (Id. at ¶ 187.) As the third and fourth alternatives, she essentially reiterates the allegations of Counts I and II, namely,

short, the claim is that the firing had nothing to do with religion and was simply another manifestation of a long-standing policy of the Catholic Church to discriminate against women.[8] According to the Plaintiff, "[a]ny legitimate non-discriminatory reason offered by the defendants for their treatment of plaintiff is a pretext for illegal discrimination based upon her gender or Title VII protected activities." (*Id.* at ¶ 190.)

■ The Defendants attack the Plaintiff's Federal Claims on several bases, the most significant of which is the argument that applying Title VII to Ursuline's decision to fire the Plaintiff would be contrary to the Religion Clauses of the Constitution and to Congressional intent in enacting Title VII. (*See* D.I. 15 at 4–12; D.I. 16 at 16–22.) Because "constitutional issues should be avoided whenever possible[,]" *Little v. Wuerl,* 929 F.2d 944, 947 (3d Cir.1991), the second point raised by the Defendants must be addressed first, although construing Title VII in this context unavoidably involves a discussion of the Religion Clauses.

■ The United States Supreme Court's analytical approach in *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), calls for a two pronged analysis in determining whether Title VII applies and raises a

conflict with the Religion Clauses in this case. The "prudential policy" of avoiding a construction that would put the statute at odds with the Constitution is explicit. *Id.* at 500–01, 99 S.Ct. 1313; *see also Little,* 929 F.2d at 947 ("an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available"). First, I must consider whether applying Title VII to Urusline's decision in this case would raise substantial constitutional questions.[9] If it would, I am then required to determine whether Congress clearly expressed an intent that Title VII be applied to that kind of decision. *See Little,* 929 F.2d at 947 (describing analysis required by *Catholic Bishop* ).

*i. Applying Title VII raises substantial constitutional questions.*

With respect to the first prong, whether application of Title VII would raise constitutional questions, the answer is an emphatic "yes." The Plaintiff's proposed construction of Title VII as preventing a Catholic school from disciplining a religion teacher who publicly repudiates a central tenet of the Catholic faith raises constitutional concerns in the starkest terms. With only slight disguise, it calls for court-imposed value judgments about religious doctrine and court supervision of church discipline. Short of a declaration that the

---

that she was fired for opposing illegal discriminatory practices of the Defendants' (*id.* at ¶ 188) and that she was fired because of her abortion rights advocacy and association, which she calls here "gender related advocacy and association" (*id.* at ¶ 189).

8. In the Plaintiff's view, "[h]istorically this bishop and his religious denomination have discriminated against women, by, for example, refusing them the opportunity to be ordained priests or deacons in their religious faith." (D.I. 1 at ¶ 221.)

9. The Third Circuit has framed the test under *Catholic Bishop* in two ways. As described

above, it has said that the first issue is whether the application of the statute raises a "substantial constitutional question." *See Little,* 929 F.2d at 947. It has also framed the issue as whether application of the law "presents a *significant risk* that the First Amendment [would] be infringed." *Geary v. Visitation of the Blessed Virgin Mary Parish Sch.,* 7 F.3d 324, 327 (3d Cir.1993) (quoting *Catholic Bishop,* 440 U.S. at 502, 99 S.Ct. 1313; internal quotation marks omitted; emphasis from *Geary* ). While I have chosen to use the "substantial question" characterization of the issue, the analysis and conclusions that follow would be the same were I to have used the "significant risk" characterization instead.

Pope should pass draft encyclicals through the courts for approval, it is hard to conceive of a more obvious violation of the free exercise rights of the Catholic Church or a clearer case of inappropriate entanglement of church and state.

■■■ That conclusion is dictated by the broad language of the Religion Clauses [10] and it follows from controlling precedent. As to free exercise rights, it is well-settled that "[t]his basic freedom is guaranteed not only to individuals but also to churches in their collective capacities . . . ." *Little,* 929 F.2d at 947 (quoting *Rayburn v. General Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1167 (4th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986)). Churches must have "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* (quoting *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952)). Title VII cannot and does not override that fundamental constitutional freedom.

■■■ Title VII's inapplicability is particularly obvious when the alleged victim of discrimination by a religious institution is a "minister" of the faith. "[C]ourts have consistently found that Title VII does not apply to the relationship between ministers and the religious organizations that employ them, even where discrimination is alleged on the basis of race or sex." *Id.* at 947 (citing *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972); *Rayburn,* 772 F.2d at 1167). Here, while not a member of the ordained clergy, the Plaintiff was nevertheless a teacher of religion at the School and therefore arguably subject to this blanket ministerial exception. *See E.E.O.C. v. Catholic Univ. of*

*Am.,* 83 F.3d 455, 461 (D.C.Cir.1996) (applying the ministerial exception to a nun that complained of sex discrimination in college tenure decision; noting that the "ministerial exception has not been limited to members of the clergy. It has also been applied to lay employees of religious institutions whose primary duties consist of teaching . . . .") (internal quotation marks and citation omitted); *cf. Geary,* 7 F.3d at 331 (noting distinction between cases involving clergy "and cases in which employees did not have duties of a religious nature"; holding that claim by teacher with "only a general employment obligation to be a visible witness to the Catholic Church's philosophy and principles" could be reviewed without government entanglement with religion). The Plaintiff argues, however, that cases involving the ministerial exception are inapposite, since they generally "deal[ ] with the pervasively religious relationship between a member of the clergy and his religious employer." (D.I. 18 at 44 & n. 9) (quoting *DeMarco v. Holy Cross High School,* 4 F.3d 166, 171 (2d Cir.1993) (applying the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*).)

■■■ I am inclined to believe that a religion teacher at a parochial school does indeed fall within the ministerial exception, but I need not conclusively answer that question because, regardless of the answer, the deep respect for free exercise rights upon which the exception is based still requires extraordinary judicial caution when addressing claims by lay employees whose duties have religious significance. *See Little,* 929 F.2d at 948 ("[A]ttempting to forbid religious discrimination against non-minister employees where the position

---

**10.** The Establishment and Free Exercise Clauses of the First Amendment state: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

involved has any religious significance is uniformly recognized as constitutionally suspect, if not forbidden.") Here, the alleged victim of gender discrimination was a parochial school teacher of religion and of English, the latter subject, as well as the former, giving rise to frequent discussion of moral issues, as both sides acknowledge. (*See* D.I. 1 at ¶¶ 192–93; D.I. 15 at 17; D.I. 16 at 18.) In light of the School's mission and the responsibilities of the Plaintiff's teaching position, the religious implications of the School's disciplinary decision is beyond reasonable dispute. *Cf. Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. 1313 ("In recent decisions involving aid to parochial schools we have recognized the critical and unique role of the teacher in fulfilling the mission of a church-operated school."); *Little*, 929 F.2d at 948 ("The religious significance of parochial schools— and their teachers in particular—is proclaimed by the Catholic Church, [and] has been recognized by the courts ...."). Those religious implications are particularly clear in the circumstances of this case, in which the Plaintiff was fired during a controversy she helped create over the Catholic Church's long-established doctrinal opposition to abortion.[11] At a minimum, then, it must be acknowledged that permitting the Plaintiff to bring a sex discrimination claim would raise substantial constitutional questions under the Free Exercise Clause.[12]

 Substantial constitutional questions are also implicated by the Establishment Clause of the First Amendment. That clause forbids excessive government entanglement with religion, *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and it is evident that judicial review of the School's decision here risks exactly that. The Third Circuit has highlighted the Supreme

---

11. This undisputed factual background distinguishes the case from the circumstances in *Geary*, 7 F.3d 324 (3d Cir.1993). In that case, the Third Circuit held that the ADEA could apply to a parochial school's employment decision, but it was careful to note that "Geary's claims do not inevitably or even necessarily lead to government inquiry into Visitation School's religious mission or doctrines." *Geary*, 7 F.3d at 329. The Court went on to emphasize that the ADEA could apply and a pretext analysis could properly be undertaken only because "Geary does not challenge the validity of the religious doctrine" on which the employment decision was based, which, in that case, was the prohibition on marriage to a previously divorced individual. *Id.* Here, despite the plaintiff's allegations of pretext, nothing is clearer than that she has directly challenged the validity of the Catholic position on abortion. In this case, the plaintiff's Federal Claims do indeed necessarily and inevitably lead to government inquiry into the Catholic Church's abortion position and the religious mission of the School, and hence are forbidden by the First Amendment. *Id.* at 330 ("[T]he First Amendment dictates that a plaintiff may not challenge the validity, existence or 'plausibility' of a proffered religious doctrine ...." (citation omitted)).

12. That conclusion also follows from an application of the "church autonomy" doctrine, a doctrine based on the Religion Clauses and rooted in "a long line of Supreme Court cases[.]". *See Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 655 (10th Cir.2002) (internal quotation marks and citation omitted) (applying the "church autonomy" doctrine in affirming summary judgment against plaintiffs alleging sexual harassment against church that terminated lay employee for being openly lesbian). The Plaintiff vigorously asserts that her firing was dictated by local authorities of the Catholic Church. (*E.g.*, D.I. 1 at ¶ 220.) Her claim, therefore, must be viewed as insisting on a right to prevent a religious institution from disciplining an employee who publicly renounces the institution's doctrine. Since "the First Amendment does not permit federal courts to dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices[,]" *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618, 626 (6th Cir.2000), that insistence cannot be given legal sanction.

Court's explicit warning about the consequences of judicial review in a context such as this:

> The resolution of such [unfair labor practice] charges ..., in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the [National Labor Relations] Board which may impinge on rights guaranteed by the Religion Clauses, *but also the very process of inquiry* leading to findings and conclusions.

*Catholic Bishop*, 440 U.S. at 502, 99 S.Ct. 1313 (quoted in *Little*, 929 F.2d at 949) (emphasis added). Hence, all of the Plaintiff's federal claims raise substantial Establishment Clause concerns.

That is perhaps most obvious with regard to Count III of the Complaint. As previously noted (*supra* at 10–11), that Count goes on at length in its accusations that religious concerns were only a pretext for the Plaintiff's firing.[13] As evidence of that, the Plaintiff alleges several instances of what she perceives to be "inconsistencies" between the School's publicly stated reason for firing her, i.e., her "serious disagreement with a basic tenet of church teaching[,]" (D.I. 1 at ¶ 196), and other decisions the School has made. (*Id.* at ¶¶ 191–218; 224–26.) For example, she alleges that Ursuline could not really have fired her for publicly opposing the Church's teachings on abortion because the School employs a "male teacher who publically practices the Jewish religion and publicly disagrees with every major tenet and doctrine of Catholic teaching." (*Id.* at ¶ 197.) To test the Plaintiff's theory would require an analysis of Catholic doctrine to determine whether the decision to employ a teacher of a different religious background constitutes an affront to the Catholic faith and, if so, whether it is an affront of at least the same seriousness as the Plaintiff's repudiation of Catholic doctrine on when life begins and the responsibility to preserve human life *in utero*.

Such a judicial analysis is in itself forbidden by the constitution:

> The federal courts are not in the business of enforcing religious orthodoxy or requiring consistency and uniformity in religious beliefs or practices. If a particular religious community wishes to differentiate between the severity of violating two tenets of its faith, it is not the province of the federal courts to say that such differentiation is discriminatory and therefore warrants Title VII liability
>
> . . . . .

*Hall*, 215 F.3d at 626–27 (quoting lower court opinion; citation omitted); *see also Little*, 929 F.2d at 949 (where a claim involves a question of plaintiff's fitness to further the religious mission of a school, "[i]t is difficult to imagine an area of the employment relationship *less* fit for scrutiny by secular courts" (original emphasis)).

> *ii. Congress did not intend for Title VII to apply.*

Having determined that the Federal Claims raise substantial constitutional questions, I must now ask "whether Congress clearly expressed an intent that Title VII be applied" in a case like this. *Little*, 929 F.2d at 947. The answer is "no."

Nothing in the language of Title VII bears the interpretation that the Plaintiff

---

13. Interestingly, those allegations of pretext are contradicted by the Plaintiff's own declaration that "there is direct evidence that plaintiff was terminated for her advocacy of the rights of women and her association" (*id.* at ¶ 168), in other words for advocating abortion and associating with abortion rights advocacy groups.

wishes to give it. On the contrary, Title VII was expressly amended in 1972 to make it clear that Congress did not intend for church sponsored educational institutions to fall within the scope of the statute when they choose to employ only those who share their religious beliefs. Section 2000e–2(e) states, in pertinent part,

> Notwithstanding any other provision of this subchapter, ... it shall not be an unlawful employment practice for a school ... to hire and employ employees of a particular religion if such school ... is, in whole or in substantial part ... directed toward the propagation of a particular religion.

As the Third Circuit has noted, "the legislative history [of that amendment] ... suggests that the sponsors of the ... exception were solicitous of religious organizations' desire to create communities faithful to their religious principles." *Little,* 929 F.2d at 950. The Court was "persuaded that Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'" *Id.* at 951.

■ The Plaintiff freely acknowledges that the mission of Ursuline includes the propagation of the Catholic religion. (*See* D.I. 1 at ¶¶ 28–32.) She has chosen, for reasons that are no doubt deeply felt, to dispute Catholic teachings on abortion. Her effort to characterize as gender discrimination what is plainly, by the facts

she admits, a doctrinal dispute does not alter the essential nature of that dispute or the clear Congressional intent to keep the government, including the courts, out of such entanglements. It is not the place of this or any other court to say what system of beliefs constitutes "true" Catholicism or makes for a "good" Catholic. Ours is a system which, wonderfully, forbids any intrusion of the sort. Consequently, the Plaintiff's Federal Claims are without a basis in law and they will be dismissed with prejudice.[14]

## B. *The State Claims*

■ As previously noted (*supra* at 1, 8), the Plaintiff's State Claims are for defamation (D.I. 1 at ¶¶ 230–56), invasion of privacy (*id.* at ¶¶ 257–82), and tortious interference with contractual relations (*id.* at ¶¶ 283–314). The only basis to consider those claims in this court is, as the Plaintiff has acknowledged (*id.* at ¶ 3), the supplemental jurisdiction provided in 28 U.S.C. § 1367. Since I have decided that the Plaintiff's Federal Claims must be dismissed, it is within my discretion whether to retain jurisdiction over the State Claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ...."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 444 (3d Cir.1997) (decision to exercise supplemental jurisdiction "is committed to the sound discretion of the district court").

14. Because I have concluded that Title VII does not apply under these circumstances, I need not reach the third step of the analysis described by the Third Circuit as flowing from the Supreme Court's opinion in *Catholic Bishop:*
> First, a threshold question: would application of the statute present a significant risk of infringing the First Amendment? Sec-

ond, the interpretive rule: is there a permissible construction of the statute that avoids that risk, or alternatively, is there a clear expression that Congress intended that the statute apply? And, third: if the statute applies, does it violate the Religion Clauses of the First Amendment?
*Geary,* 7 F.3d at 327.

Because the Defendants' motions to dismiss were filed early in the case, the parties have not invested significant resources in litigating the State Claims in this forum. To the extent any resources have been invested, that investment will not be lost simply because the issues are to be addressed in a state court of competent jurisdiction. It is therefore neither wasteful nor unfair to decline to exercise supplemental jurisdiction in this matter. *Queen City Pizza,* 124 F.3d at 444 (district court's decision to decline the exercise of supplemental jurisdiction was proper since it "would not be unfair to the litigants or result in waste of judicial resources"). Declining jurisdiction allows the Plaintiff's claims under Delaware law to be addressed, as is proper, by the courts of Delaware. Accordingly, the State Claims will be dismissed without prejudice.

V. *Conclusion*

Based on the foregoing reasons and authorities, Counts I through III of the Plaintiff's Complaint (D.I.1) will be dismissed with prejudice, and Counts IV through VI will be dismissed without prejudice. An appropriate order will follow.

### *ORDER*

The Court having before it the Motion to Dismiss filed by The Urusline Academy of Wilmington, Delaware, Inc., Barbara C. Griffin, and Jerry Botto (Docket Item ["D.I."] 10), and the Motion to Dismiss filed by the Catholic Diocese of Wilmington, Inc. and the Bishop of the Diocese, Michael A. Saltarelli (D.I.11), and having considered the arguments and authorities advanced in support and in opposition to those motions,

IT IS HEREBY ORDERED, for the reasons set forth in the Memorandum Opinion issued in this case today, that Counts I through III of the Complaint (D.I.1) are dismissed with prejudice, and

Counts IV through VI of the Complaint are dismissed without prejudice.